IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

SANDY N. WEBB,

*Plaintiff*,

v.

Civil Action No. ELH-11-2105

GREEN TREE SERVICING, LLC,

*Defendant*.

**MEMORANDUM OPINION**

Sandy N. Webb, plaintiff,[1] sued her mortgage servicer, Green Tree Servicing, LLC

("Green Tree"), defendant, alleging several torts and statutory violations arising out of Green

Tree's conduct with respect to her mortgage.[2]  In particular, in her Amended Complaint (ECF

26), plaintiff asserted five counts: interference with a business relationship (Count I); breach of

contract (Count II); trespass to land (Count III); violation of the Fair Debt Collection Practices

Act ("FDCPA"), 15 U.S.C. §§ 1692 *et seq.* (Count VI); and common law negligence based on

---

[1] Plaintiff is an attorney licensed to practice law in Maryland and a member of the bar of this Court.  However, she resides in Oregon.  Webb is self-represented in this case.

[2] Plaintiff filed suit in the Circuit Court for Queen Anne's County, Maryland. Green Tree removed the suit to federal court on the basis of diversity jurisdiction.  *See* 28 U.S.C. § 1332(a); 1441; *see also* Notice of Removal (ECF 1).   More than $75,000 is in controversy, and the citizenship of the parties was completely diverse at the time the action commenced.  *See Webb v. Green Tree Serv'g, LLC*, Civ. No. ELH-11-2105, 2011 WL 6141464, at *1 n.2 (D. Md. Dec. 9, 2011) (ECF 16).   *See also Grupo Dataflux v. Atlas Global Gp., L.P.*, 541 U.S. 567, 571 (2004) (stating that diversity jurisdiction in cases removed from state court depends on citizenship at time case is initiated, not time case is removed); *Athena Automotive, Inc. v. DiGregorio*, 166 F.3d 288, 290 (4th Cir. 1999) ("Because diversity jurisdiction depends on the citizenship status of the parties at the time an action commences, we must focus our jurisdictional inquiry solely on that time."); *Forrest v. Green Tree Serv'g, LLC*, Civ. No. ELH-13-1525, 2013 WL 3270447, *3-5 & n.3 (D. Md. June 25, 2013) (recognizing that, although Green Tree subsequently became a citizen of Maryland due to a change in the membership of the company, the change in citizenship does not affect jurisdiction in previously commenced actions).

breach of the statutory duties imposed by the FDCPA (Count VII). Those five counts survived challenges to the sufficiency of pleading. *See Webb v. Green Tree Serv'g, LLC*, Civ. No. ELH-11-2105, 2011 WL 6141464 (D. Md. Dec. 9, 2011) (ECF 16 & 17) ("*Webb I*") (granting in part and denying in part motion to dismiss) and 2012 WL 2065539 (D. Md. June 7, 2012) (ECF 52 & 53) ("*Webb II*") (granting in part and denying in part motion to strike amended complaint). In so ruling, I determined that all of the common law claims in this case are governed by Maryland law. *See Webb I*, 2011 WL 6141464, at *4 n.12; *Webb II*, 2012 WL 2065539, at *6 n.7.[3]

Thereafter, the case proceeded to discovery. In the course of discovery, Green Tree filed a Third-Party Complaint (ECF 39) against Five Brothers Mortgage Company Services and Securing, Inc. ("Five Brothers"), a business entity that plaintiff alleged had acted as Green Tree's agent. Upon the conclusion of discovery, the Third-Party Complaint was voluntarily dismissed, pursuant to Fed. R. Civ. P. 41(a). *See* ECF 70 & 73.

Three motions are now at issue. Green Tree filed a Motion for Summary Judgment (ECF 74) and a supporting memorandum (ECF 74-1) (collectively, the "Motion"); plaintiff filed a Cross-Motion for Summary Judgment ("Cross-Motion") (ECF 75); and Green Tree filed a

---

[3] Plaintiff's Amended Complaint is the operative pleading. Hereafter, unless otherwise specified, references to plaintiff's "complaint" refer to her Amended Complaint.

Plaintiff's original Complaint (ECF 2) contained claims of invasion of privacy by intrusion upon seclusion (Count IV) and non-statutory negligence (Count V). Those counts were subsequently dismissed. *See Webb I*, 2011 WL 6141464, at *10-12. When plaintiff filed her Amended Complaint, adding the two FDCPA-related counts, she continued the numbering of the counts with Counts VI and VII, despite the dismissal of Counts IV and V. In a subsequent ruling, I struck a portion of Count VII, which alleged negligence based on breach of statutory duties under the Protecting Tenants at Foreclosure Act, Pub. L. No. 111-22, 123 Stat. 1632, §§ 701 *et seq.* (2009), *as amended by* Pub. L. No. 111-203, 124 Stat. 1376, § 1484 (2010), and its Maryland state-law counterpart, Md. Code (2010 Repl. Vol., 2011 Supp.), § 7-105.6(b)(2) of the Real Property Article. *See Webb II*, 2012 WL 2065539, at *7-8. I also observed that, although Count VII is captioned "Negligence *Per Se*," Maryland does not adhere to a negligence *per se* regime in actions for negligence based on the violation of statutory duties. *See id.* at *6.

Motion for Sanctions pursuant to Rule 11 of the Federal Rules of Civil Procedure ("Sanctions Motion") (ECF 77).[4] The summary judgment motions have been fully briefed,[5] and no hearing is necessary to resolve them. *See* Local Rule 105.6. For the reasons that follow, I will grant Green Tree's Motion and deny plaintiff's Cross-Motion. Pursuant to Local Rule 105.8(b), I will direct plaintiff to respond to the Sanctions Motion and, in the interim, deny that motion, without prejudice to Green Tree's right to renew the Sanctions Motion following plaintiff's submission.[6]

### Factual Background

At all times relevant, Ms. Webb owned a parcel of real property in Grasonville, Maryland, containing a single family home, which she purchased in December 2006 (the "Property" or the "Residence"). *See* Deposition of Sandy N. Webb at 31 ("Webb Dep.").[7] Ms. Webb financed her purchase of the Property by means of a mortgage loan in the amount of $209,900 from National City Mortgage ("National City"), a lending institution that is not a party to this case. The loan was evidenced by a promissory note (the "Note"), *see* Ex.B to Motion

---

[4] The parties also filed a flurry of ancillary motions relating to various aspects of the briefing of the cross-motions for summary judgment, which are discussed and resolved *infra*.

[5] In connection with the cross-motions for summary judgment, I have considered Green Tree's Motion; plaintiff's Cross-Motion (including her opposition to the Motion); Green Tree's consolidated reply in support of its Motion and opposition to the Cross-Motion ("Green Tree Reply") (ECF 79); plaintiff's reply ("Webb Reply") (ECF 80); and other supplemental submissions, as discussed, *infra*.

[6] Pursuant to Local Rule 105.8(b), which governs motions for sanctions, I cannot resolve the Sanctions Motion until plaintiff responds to it, if and as ordered by the Court. Local Rule 105.8(b), entitled "Responses Required Only Upon Court Order," provides: "Unless otherwise ordered by the Court, a party need not respond to any motion filed under Fed. R. Civ. P. 11 or 28 U.S.C. § 1927. The Court shall not grant any motion without requesting a response."

[7] Both sides have submitted excerpts from various depositions as exhibits. As to each deposition, I cite to the pagination of the deposition transcript, rather than the pagination of any particular excerpt submitted by either party. Excerpts from Ms. Webb's deposition are contained in ECF 74-2 and ECF 77-5.

(ECF 74-3), dated December 21, 2006, between Ms. Webb as "Borrower" and National City as "Lender." Under the Note, plaintiff was obligated to repay the mortgage loan over a thirty year period, with interest at a fixed annual rate of 6.375%, by monthly payments of $1,309.51 due on the first of each month. *See id.* at 1. The loan obligation was secured by a Deed of Trust executed by Ms. Webb, also dated December 21, 2006, *see* Deed of Trust, Ex.C to Motion (ECF 74-4), placing the Property in trust for the benefit of National City, as security for repayment under the Note.[8]

Ms. Webb resided at the Property from mid December 2006 until May 2008. *See* Webb Dep. at 41, 46, 55-56. After unsuccessfully placing the Property on the market for sale in the Spring of 2008, *see id.* at 54-56, Ms. Webb moved to Oregon in May 2008. *Id.* at 46. Beginning in June 2008, Ms. Webb rented the Property to a series of tenants. *See id.* at 56.

_____

[8] Under Maryland law, the real property security arrangement established by a deed of trust is technically distinct from a "common law mortgage." *Legacy Funding LLC v. Cohn*, 396 Md. 511, 513 n.1, 914 A.2d 760, 761 n.1 (2007). The principal distinction is this:

> "There are two parties to a mortgage; the mortgagor (debtor) and the mortgagee (creditor). Deeds of trust are three party instruments; the grantor (debtor), the grantee (trustee) and the cestui que trust or beneficiary (creditor). When a mortgage is used, the property is conveyed directly to the creditor. With a deed of trust, the property is conveyed to a third party in trust for the benefit of the creditor."

*Wellington Co., Inc. Profit Sharing Plan v. Shakiba*, 180 Md. App. 576, 594, 952 A.2d 328, 339 (2008) (citation and emphasis omitted).

Despite the "differences between the two instruments, [the Maryland appellate courts] have generally treated them the same" and, in cases involving deeds of trust, courts often "refer to the instruments as mortgages and the debtors as mortgagors." *Legacy Funding*, 396 Md. at 513 n.1, 914 A.2d at 761 n.1; *see LeBrun v. Prosise*, 197 Md. 466, 473-74, 79 A.2d 543, 547 (1951) ("For most purposes [a] deed of trust *is* a mortgage.") (emphasis in original); *Manor Coal Co. v. Beckman*, 151 Md. 102, 115-16, 133 A. 893 (1926) ("'A deed of trust to secure a debt is in legal effect a mortgage.'") (citation omitted). The trustee under the Deed of Trust here was Lawyers Title Insurance Corporation, a non-party.

At some point, PNC Bank became National City's successor by merger. Subsequently, PNC Bank assigned the Deed of Trust and the Note, "together with all interest secured thereby, all liens, and any rights due or to become due thereon," to Green Tree, by an Assignment of Mortgage (the "Assignment") filed in the Land Records of Queen Anne's County, Maryland, on March 30, 2010. Assignment, Ex.1 to Cross-Motion (ECF 75-1 at 1-2).[9]

By a Lease Agreement (the "Lease") dated August 6, 2010, Ms. Webb rented the Property to a tenant, Christina Klamp, for a term described in the Lease as "a term of 12 months, beginning on 8/15/10, and ending at 11:59 PM on 8/30/11." Lease at 1, Ex.22 to Cross-Motion (ECF 75-22 at 2-6). The monthly rent under the Lease was $1,200. *See id.*

In September 2010, just over a month after the Lease was executed, Ms. Webb's husband,[10] a Naval reservist, sustained a serious injury to his back while on duty in San Diego. *See* Webb Dep. at 135. Ms. Webb's husband underwent hospitalization due to the injury and was unable to work for several months, which placed significant financial strain on the couple. *See id.* at 134-37. Because their "income was dramatically reduced overnight" due to her husband's injury, *id.* at 135, Ms. Webb ceased making monthly payments toward the mortgage on the Property as of October 2010; the payment due on September 1, 2010, was the last monthly mortgage payment that was made by Webb. *See id.* at 134.

---

[9] Green Tree also submitted a copy of the Assignment as Exhibit D to its Motion (ECF 74-5), but the copy submitted by Green Tree does not include the signature page. Although the Assignment was filed in the land records on March 30, 2010, it states that its "Effective Date" was November 1, 2009. Assignment at 1. It was executed by a vice president of PNC Bank on February 18, 2010. *Id.* at 2. The parties dispute which of those dates is the date that Green Tree "obtained" or "received" the debt, within the meaning of the FDCPA. *See* 15 U.S.C. § 1692a(4), (6)(F)(iii). Their dispute is addressed in the Discussion.

[10] Ms. Webb married her husband sometime after she purchased the Property. *See* Webb Dep. at 40.

The acts of Green Tree and its alleged agent, Five Brothers, that are at issue in this suit occurred during Ms. Klamp's tenancy, after Ms. Webb became delinquent on her mortgage payments. In order to frame the issues properly, it is necessary to set out the alleged facts as plaintiff presented them in her complaint,[11] before presenting the undisputed material facts drawn from the summary judgment record that is now before the Court.

## A. Facts Alleged in the Amended Complaint

Although Ms. Webb was in default of her payment obligations in January 2011, "the Residence had not been foreclosed on." Amended Complaint ¶ 10. Ms. Webb "was informed on January 18, 2011 by her tenant" (*i.e.*, Ms. Klamp, although the complaint does not identify the tenant by name) that Ernest Wood,[12] a representative of Green Tree, "was calling her and asking questions about Mrs. Webb's whereabouts because Green Tree 'needed to get a hold of her regarding her mortgage status.'" *Id.* ¶ 13. The tenant (*i.e.*, Ms. Klamp) "was contacted at work and home by Green Tree about the homeowner's mortgage status," and Mr. Wood was "harassing the tenant or telling her inappropriate and private information about the collection matter," despite the fact that "Mrs. Webb was in contact with Green Tree and Green Tree knew where Mrs. Webb lived because she was in weekly contact via phone with Green Tree's representative." *Id.* Ms. Webb told Mr. Wood "on January 19 & 20, 2011 that he could not contact the tenant living at the Residence, either at the home or at work." *Id.* However, Mr. Wood "continued calling the tenant at work and home on the days of January 18, 19 & 20." *Id.*

_____

[11] Although the Amended Complaint added two new counts and revised plaintiff's damages requests, it presented the same substantive factual allegations as the original Complaint.

[12] Mr. Wood, an employee of Green Tree, was identified only as "Ernie" in the complaint. *See* Amended Complaint ¶ 13.

On January 27, 2011, an unidentified person "was walking around the Residence and approached the tenant, and told the tenant they were coming back the next day to clear the tenant's stuff out of the Residence, put new locks on the doors, and board up the windows because the home had been foreclosed by the bank." *Id.* ¶ 7. This unidentified person allegedly was an "employee" of Five Brothers. *Id.* ¶ 8. The Five Brothers employee "was found on the Residence property looking around and clearly inside the private areas of the yard and peering through windows." *Id.* "The tenant contacted Mrs. Webb because she was 'freaked-out' and confused about the situation." *Id.* ¶ 7.

Ms. Webb alleged that she was able to speak by phone with the Five Brothers employee at the Property, who gave her Five Brothers' toll-free phone number, stating: "'[I]t didn't matter what [Mrs. Webb] had to say, it only mattered to the employee if the Residence was on a list to be cleared and boarded up because he [(the employee)] takes his direction only from the mortgage company who owns the home.'" *Id.* ¶ 8 (quoting employee) (brackets and alterations in original). According to plaintiff, she had not received any notice of an inspection of the Property from Green Tree. *Id.* ¶ 29.

Despite spending "a large part of January 27, 2011 on the phone" with representatives of Five Brothers and Green Tree "trying to clear up the confusion and the improperly ordered . . . home clean-out," Ms. Webb claimed that she was unable to receive assurance that the Residence would not be cleared out. *Id.* ¶ 8. When Ms. Webb called Five Brothers' toll-free number, a Five Brothers employee told her that "'if she paid her bills this wouldn't be a problem,'" and then hung up on her. *Id.* ¶ 9 (quoting employee). Ms. Webb called back and spoke with a "supervisor who told her the only way it would call off the moving/close-up crew was if the

mortgage lender told her to take the Residence off the list of recently acquired homes," and that "Five Brothers needed nothing besides the phone call from the bank to schedule a clean-out when the bank owned the property." *Id.* Ms. Webb called Green Tree but was unable to speak with Mr. Wood and was unable to achieve a resolution of the situation. *See id.* ¶ 10-11. According to the complaint, Ms. Webb's "tenant sent her father to the Residence on January 28, 2011 to ensure no one entered the Residence and stole her furniture and personal effects or locked her out of the Residence by changing the locks." *Id.* ¶ 11.

Webb spoke with Wood on January 28, 2011, and Wood "repeatedly stated he had every right to secure the Residence as it 'had been foreclosed upon.'" *Id.* ¶ 12 (quoting Wood). Wood "kept stating that the house was vacant and had been foreclosed upon so he had the right to enter and clear it out and secure the location." *Id.* Although "Mrs. Webb explained the difference between foreclosure and default," Wood "wouldn't listen or acknowledge any difference . . . ." *Id.* Webb "was able to confirm with Green Tree that Five Brothers had been informed that the Residence should be taken off the list of bank owned properties in need of securing." *Id.* ¶ 11. However, Wood "would not provide any assurances that the he would not again place the Residence on the list to be secured by Five Brothers Mortgage Assistance." *Id.* ¶ 12.

Further, the complaint alleged, *id.* ¶ 14:

> On February 28, 2011, after much discussion with the tenant, Mrs. Webb released the tenant from her lease because Mrs. Webb could no longer promise her quiet enjoyment of the home due to the illegal and harassing actions inflicted upon the tenant by Green Tree—the tenant was a young female living alone in her first home just out of college who felt threatened and unsafe in her own home.

According to plaintiff, "[b]y running off Mrs. Webb's tenant, Green Tree turned what was a temporary setback in finances into a permanent setback from which [Ms. Webb] cannot

recover." *Id.* ¶ 15. "If the tenant had never been run off, Mrs. Webb would have been able to recover financially and return to making payments on the home." *Id.* ¶ 16. And, Ms. Webb "intended to again rent the home and make payments" but, "due to Green Tree's actions in running off tenant's from the Residence, she cannot in good conscious [sic] rent to another tenant." *Id.*

As noted, I previously concluded that five counts of the complaint stated claims upon which relief could be granted. Specifically, Count I alleged tortious interference with a business relationship largely on the basis of the following allegation in the complaint, *id.* ¶ 19:

> Green Tree . . . has harassed Mrs. Webb's tenant and interfered with Mrs. Webb's business contract with a tenant who was a bona fide tenant (having moved in prior to any default or even late payment and not being related to the homeowner in anyway). By intentional and improper conduct, Green Tree ran the tenant out of the home and harassed the tenant who was rightfully living in the home. Once the tenant was released from her lease due to homeowner's inability to provide quiet enjoyment (due to threats of breaking and entry, harassment, and actual trespass), the homeowner was without ability to collect rents to pay the mortgage once the medical and financial emergency in homeowner's family had resolved.

Counts II and III alleged breach of contract and trespass to real property, respectively, both based on the alleged entry of the Five Brothers employee onto the Property on January 27, 2011, without prior notice of inspection as required by a provision of the Deed of Trust. Plaintiff alleged: "Green Tree gave no notice, never specified any reasonable cause, and had no reasonable cause to suspect the Property was in any danger of being damaged due to a renter being in the home." *Id.* ¶ 29.

In Count VI, plaintiff alleged that Green Tree was a "debt collector" as defined by the

FDCPA,[13] and violated the FDCPA by its telephone contact with the tenant and the entry of the Five Brothers employee onto the Property. Specifically, the complaint stated, *id.* ¶¶ 53-54:

> [Green Tree] violated [the FDCPA] by engaging in conduct the natural consequence of which is meant to harass, oppress, or abuse the Plaintiff in connection with collection of a debt by calling Plaintiff's tenant at work repeatedly to "talk to" tenant about Plaintiff's "default" and sending an agent to go to the home to who told the tenant that the home had been foreclosed and that the tenant would be locked out and her items removed.

> [Green Tree] violated [another provision of the FDCPA] in that Defendants employed false and deceptive means to collect a debt by intentionally scaring off any current renter (by being hiring someone who told the tenant that the home had been foreclosed and calling her at work about the "default") and threatening to run off any future renter.

Finally, in Count VII, plaintiff alleged negligence by breach of statutory duties imposed by the FDCPA. The complaint stated that Green Tree owed a duty under the FDCPA "to not harass and/or annoy the tenant in the Residence," *id.* ¶ 57, and that "Green Tree breached that duty by calling the tenant at work and sending the Five Brothers Mortgage Assistance agents to the home to 'inspect and secure' the Residence when [Green Tree] knew the tenant was in the Residence and the Residence was not foreclosed upon or in danger of destruction/waste/damage." *Id.* ¶ 58.[14]

Notably, plaintiff's Amended Complaint was verified. Ms. Webb signed the Amended Complaint and "solemnly affirm[ed] under penalty of perjury that the contents of the foregoing

---

[13] As discussed, *infra*, Green Tree argued that it does not qualify as a "debt collector" under the FDCPA, but I ruled that this was an affirmative defense that should be resolved at the summary judgment stage on the basis of evidence outside the pleadings. *See Webb II*, 2012 WL 2065539, at *5.

[14] I expressed skepticism that "a negligence claim based on violation of the FDCPA is viable in Maryland," given that such a claim would be redundant and merely duplicative of a statutory claim arising "directly under the FDCPA." *Webb II*, 2012 WL 2065539, at *6. Nevertheless, I ruled that the negligence claim should be resolved after summary judgment, along with the FDCPA count, because it "would not expand the scope of discovery." *Id.*

complaint [were] true to the best of [her] knowledge, information and belief . . . ." *Id.* at 10.  On the strength of the foregoing allegations, the Court permitted plaintiff to "unlock the doors of discovery." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (articulating standard for dismissal of complaint for failure to state a claim upon which relief can be granted).

## B.  Undisputed Material Facts[15]

Discovery has now concluded.  The undisputed material facts disclosed by the record demonstrate unequivocally that events simply did not occur as alleged in the complaint.

As noted, Christina Klamp became plaintiff's tenant in August 2010.  Although the Lease was solely in Ms. Klamp's name, she was not the only occupant of the Property; Klamp resided there with her boyfriend, Charles "Chuck" Miller.  *See* Deposition of Christina Klamp at 24 ("Klamp Dep.").[16]  Ms. Klamp and Mr. Miller, who were young adults (Mr. Miller turned twenty in the month that the Lease began), had been dating for a year before they decided to rent a house together.  *Id.* at 25.  They made contact with Ms. Webb because an acquaintance of Mr. Miller had been a previous tenant of the Property.  *Id.*  However, Ms. Klamp was the only signatory to the Lease because Mr. Miller had poor credit.  *Id.* at 26.  Ms. Webb was aware of this arrangement and agreed to it.  *Id.* at 27; *see also* Email from Webb to Klamp and Miller of Aug. 5, 2010 (ECF 75-7 at 2).  Ms. Klamp and Mr. Miller evenly divided the $1,200 monthly rent as well as the cost of the utilities.  Klamp Dep. at 27.

_____

[15] The facts presented in this section are drawn from the exhibits submitted by the parties in connection with the cross-motions for summary judgment, subject to the Court's rulings as to evidentiary disputes that are discussed, *infra*.  The facts are presented in the light most favorable to plaintiff and, unless otherwise noted, the facts contained in this section are undisputed.

[16] Excerpts from the transcript of Ms. Klamp's deposition are contained in ECF 74-6, ECF 75-4, ECF 77-6, and ECF 80-1.

In late November 2010, Ms. Klamp and Mr. Miller's relationship ended abruptly when Ms. Klamp discovered that Mr. Miller was involved with someone else. *See id.* at 30. When the two broke up, both Ms. Klamp and Mr. Miller immediately ceased residing at the Property. Ms. Klamp last slept at the Property on November 24, 2010, the night before Thanksgiving; she then moved into her father's house. *Id.* at 48-49. Mr. Miller moved out of the Property by Sunday, November 28, 2010. *Id.* at 35. He initially stayed with a friend, and then moved in with the other woman he was seeing, whom he later married. *Id.* at 36. Although neither Ms. Klamp nor Mr. Miller resided at the Property after the weekend of Thanksgiving 2010, each left some belongings at the Property. *Id.* at 35.

On or about November 28, 2010, Ms. Klamp contacted Ms. Webb by email and phone to inform her that she and Mr. Miller had broken up and that, as a result, she "wanted to break the lease," because she "wanted to remove [her]self from anything that reminded [her] of him or was involved with him." Klamp Dep. at 30-31; *see generally id.* at 28-31; Webb Dep. at 86-89. Ms. Klamp and Ms. Webb spoke by phone that day and, according to Ms. Klamp, Ms. Webb was "extremely understanding" and "was basically trying to think of a solution." Klamp Dep. at 31. On Friday, December 10, 2010, Ms. Webb emailed Ms. Klamp and Mr. Miller, advising them that she had not yet received their rent for December, and stating, ECF 74-8 at 3:

> As I have been discussing with Christina, I am more than willing to let you look for a qualified replacement tenant to take over the lease. And once the new lease is signed by your replacement we will end your obligations under the lease. However, I really discourage using this option because to find a replacement tenant you would have to show people the home and I really don't want Christina showing the house to strangers and taking the chance she would be alone in the house with an untrustworthy person. An even bigger problem with finding a replacement tenant is that most people do not move during the winter; renters really do not reappear on the scene until late March or early April. And if you stick it out looking for a good credit/income replacement, it could take you quite a

while. So under this option, you all could be on the lease for a while paying rent while you look.

I would suggest a second option that gives you some certainty and me peace of mind that Christina isn't showing the house to strangers. Option 2 is that if you want out of the lease early, I will accept payment for January rent ($1200) and forfeiture of your security deposit (which I already have, so this is not new out of pocket money from you) as fulfillment of your obligations under the lease and I will not report any negative activity against Christina to the credit reporting agencies.

Let me know how you want to proceed and we can work on the details of your move out.

On December 14, 2010, Ms. Webb emailed Klamp and Miller again, advising that she had received their $1,200 December rental payment and reiterating: "Just let me know how you want to proceed with the house and terminating the lease." ECF 74-8 at 2. Ms. Klamp decided that she wanted to attempt to find a replacement tenant. *See* Webb Dep. at 108-09; Klamp Dep. at 40-41. At her deposition, Ms. Klamp testified that she and Ms. Webb reached an agreement that Ms. Klamp would attempt to find a replacement tenant but that, "if that didn't happen, then the lease would be terminated between [Webb] and [Klamp] in March." Klamp Dep. at 40. In other words, according to Ms. Klamp, Ms. Webb "agreed for [Klamp] to stay involved in the lease until March of 2011 unless [Klamp] found other renters to rent the house . . . ." *Id.* at 40-41; *see generally id.* at 40-43. Mr. Miller also agreed to pay his half of the rent until a replacement tenant was found or until March 2011. *Id.* at 49.

According to Ms. Klamp, she "didn't want to rent the property" and undergo the "miserable process" of "going in and out of the house that [she] didn't want to go into," in order to show it to potential tenants. *Id.* at 46. However, she "felt that was [her] only option to possibly get out of the lease even earlier . . . so [she] didn't have to continue paying until

March." *Id.* In sum, Ms. Klamp testified that, in December 2010 (and not as late as January or February 2011), she and Ms. Webb reached a "[f]irm agreement" that if no renter had been found by March 1, 2011, she would be released from the Lease. Klamp Dep. at 135.

Accordingly, by email on December 16, 2010, Ms. Klamp advised Ms. Webb that she wanted "to go ahead and post an ad on craigslist in addition to a sign in the front yard," and that "[b]eing in the house by [her]self" was not "an issue," because she could "find someone to be there with [her]." ECF 74-8 at 2. Ms. Webb responded by email the same day, advising Ms. Klamp that she would provide Klamp with a copy of the craigslist ad and pictures she had previously used to advertise the Property for rent. *Id.* Ms. Klamp posted a black and orange "For Rent" sign in the front yard of the Property, containing Ms. Klamp's cell phone number. Klamp Dep. at 44-45. According to Ms. Klamp, she showed the Property to some potential renters, but none of them ultimately entered into a lease. *Id.* at 142.

In the meantime, as of January 4, 2011, Ms. Webb was four months behind on her mortgage payments, having failed to make the payments due for October, November, December, and January. The four-month delinquency triggered an automatic request, generated by Green Tree's computer system, for a visual site inspection of the Property. *See* Declaration of Ernest E. Wood ¶ 2 ("Wood Decl."), Ex.K to Motion (ECF 74-12). The request was transmitted to Five Brothers, and an employee or contractor of Five Brothers conducted a visual site inspection of the Property on January 10, 2011.[17] The inspector submitted an inspection report noting that the Property was "Vacant per visual / Locked / No personal property visible / For rent by owner @ [Klamp's cell phone number]." Inspection Report 1/10/11 (ECF 75-20 at 4). The Five Brothers

_____

[17] The Five Brothers employee or contractor who conducted the inspection on January 10, 2011, is not identified in the record.

- 14 -

inspector also noted that there was no exterior damage to the Property and that "No Interview [was] Conducted." *Id.* The inspection report included photographs of the exterior front and what appears to be the rear or side of the Property, and a picture of the "For Rent" sign in the yard with Ms. Klamp's phone number. *See id.* (ECF 75-20 at 6).

On January 11, 2011, a notation of the results of the inspection was entered into Green Tree's electronic record for Ms. Webb's account. It stated, "Site Visit Completed"; provided the inspector's notes that the Property was "Vacant per visual / Locked / No personal property visible / For rent by owner @ [Ms. Klamp's cell phone number]"; and stated: "External inspection ordered." Green Tree Account Notes at 13, Ex.3 to Cross-Motion (ECF 75-3); *see also* Wood Decl. ¶ 3; Deposition of Ernest Wood at 24 ("Wood Dep."), Ex.15 to Cross-Motion (ECF 75-15).

Ernest Wood, a "collection representative" in Green Tree's mortgage collections department, was assigned to Ms. Webb's account. Wood Decl. ¶ 1. Green Tree's electronic record for Ms. Webb's account indicates that, after speaking with Ms. Webb by phone on numerous occasions regarding her delinquent payments in October and November 2010, *see* Green Tree Account Notes at 17-24, Mr. Wood had been unable to reach Ms. Webb by phone in December or from the start of January through January 13, 2011, despite attempts every few days. *See id.* at 13-17. On some but not all occasions, Mr. Wood left messages for Ms. Webb asking her to return his calls. *See id.*[18]

_____

[18] Plaintiff alleges that she called Green Tree in January 2010 and left numerous voice messages for Mr. Wood that are not reflected in Green Tree's records. *See* Webb Decl. ¶ 17. In considering Green Tree's Motion, the Court must assume the truth of these averments. Plaintiff has submitted deposition testimony of Mr. Wood that voice messages from a borrower would not necessarily be reflected in the electronic record and that it was within his discretion whether to

On January 13, 2011, having seen the report of the January 10 inspection in the electronic record, and being "[c]oncerned that the Property was vacant," Wood Decl. ¶ 4, Mr. Wood called Ms. Webb but again she did not answer and he left a message. *Id.*; *see also* Green Tree Account Notes at 13. On January 17, 2011, Mr. Wood called Ms. Webb again and again got no answer. Wood Decl. ¶ 5; Green Tree Account Notes at 12. He then called the phone number listed on the "For Rent" sign, as stated in the inspection report, which he "assumed was associated with [Ms. Webb]." Wood Decl. ¶ 6. In reality, of course, it was Ms. Klamp's phone number.

Mr. Wood's notes for January 17, 2011, entered into the electronic record for Ms. Webb's account, state, Wood Dep. at 23; *see also* Green Tree Account Notes at 12:[19]

> Tried home. Left message to call back. Tried [Klamp's cell phone number], contact for rental. Talked to lady. Said app[20] not at that number. Advised MS[21] this is the number on the sign for rental contact. MS said she will get

---

make a note of a voice message. *See* Wood Dep. at 24-25. Moreover, she has submitted deposition testimony of Curtis Baker, another employee of Green Tree (apparently in a supervisory position within Wood's department, although the portion of Baker's deposition in which he presumably described his position is not contained in the record), who indicated that collection representatives are required to note in the records all messages received from borrowers. *See* Deposition of Curtis Baker at 36-37, Ex.14 to Cross-Motion (ECF 75-14). However, plaintiff provides no indication of the content of any of her messages. In particular, she does not indicate that she ever told Mr. Wood that the Property was occupied. Without any indication of the content of Ms. Webb's messages, the mere fact that she left them does not generate a dispute of material fact as to what Wood and Green Tree knew or intended in January 2010.

[19] Mr. Wood's notes as contained in the electronic system are typed in a form of shorthand that omits most vowels from words and uses frequent acronyms and jargon terms. As such, it is difficult to decipher. The quoted text is actually what Mr. Wood read (and interpreted) from his notes at his deposition.

[20] The exact connotation of "app" is not clear, but it is a reference used in the notes repeatedly to refer to Ms. Webb. In the electronic notes, the term is typed "AP."

[21] The exact connotation of "MS" is also unclear, although in this context it refers to Ms. Klamp. In the electronic notes, it appears to refer ordinarily to the person with whom Mr. Wood was speaking in a given phone call (perhaps it stands for "Ms.").

message to app. Left message to call back. Home not qualified . . . for hamp[22] as is a rental property. Account needs to be brought current plus legal fees.

Green Tree's electronic record for Ms. Webb's account reflects another attempt to contact Ms. Webb by telephone (via Ms. Klamp) on January 20, 2011. Mr. Wood's notation from January 20, 2011 states, Wood Dep. at 23; *see also* Green Tree Account Notes at 12:

Tried home. Left message to call back. Tried [Klamp's cell phone number]. Talked to lady. She said she is a previous tenant. Said she is trying to get the property rented out for the app as she was breaking the lease. Asked MS [when] . . . the last rent payment was made. MS said she had made all her payments and is current with app. Advised MS they'll . . . [s]till need to have app call in. MS said okay. Tried work. No longer in service.

According to Mr. Wood, he made this second call to "the number displayed on the 'for rent' sign, solely in an attempt to locate Plaintiff," and he "learned, for the first time, that the number on the sign belonged to Ms. Klamp, who described herself as Plaintiff's 'former tenant.'" Wood Decl. ¶ 9. In his declaration, Wood stated, *id.*:

Ms. Klamp further informed me that she was "breaking the lease" and was attempting to rent the Property. In an effort to confirm the status of the Property, I inquired as to when Ms. Klamp made her last rent payment to Plaintiff. Ms. Klamp responded that she had made all her rental payments to Plaintiff and I reiterated that I needed Plaintiff to contact me. At no time during this conversation did I reveal any information to Ms. Klamp regarding Plaintiff's mortgage loan.

Wood did not mention any calls to Klamp other than the ones on January 17 and 20. Nor are any other phone conversations with Klamp memorialized in Green Tree's electronic records.

At her deposition, Ms. Klamp's recollection was not inconsistent with Mr. Wood's notes and averments, although Ms. Klamp repeatedly stated that her memory on these points was not

---

22 The acronym HAMP refers to the Home Affordable Modification Program, a federal initiative authorized by §§ 109 and 110 of the Emergency Economic Stabilization Act of 2008, Pub. L. 110-343, 122 Stat. 3765 (Oct. 3, 2008), intended to avoid foreclosures by creating incentives for mortgage lenders and servicers to modify outstanding mortgage loans.

precise, and she needed to review an email she wrote on January 18, 2011, to refresh her recollection as to some of the details of the call on January 17, 2011. Klamp Dep. at 70-77.

As to January 17, 2011, Klamp recalled that she received a call from "Ernie" on that date, and he "was looking for Ms. Webb." *Id.* at 70. According to Klamp, that call was the first one that she ever received from Mr. Wood, *id.* at 71, and, "[f]rom the best that [she] can remember, [she] was contacted twice." *Id.* at 75-76; *see also id.* at 79.

In the call on January 17, Mr. Wood stated that he was trying to "contact" Ms. Webb, but Ms. Klamp could not recall whether he said why he was calling. *Id.* at 70. In any event, Klamp did not give Webb's phone number to Wood because she "didn't know who Ernie was" and "didn't feel comfortable giving Sandy's personal information to him." *Id.* Klamp explained: "As far as I knew, it was just some random man calling me at work looking for Sandy . . . ." *Id.*[23] As a result of the phone call, Ms. Klamp emailed Ms. Webb on January 18, 2011, stating: "A man named Ernie from Green Tree Servicing called me yesterday looking for your number. I refused to give it to him…I told him I would give you his instead. I'm not quite sure what it was in reference to, but I just wanted to let you know." ECF 75-13 at 6 (ellipsis in original).

Ms. Klamp did not recall the exact date of the second call, but she "want[ed] to say it was within the same month" as the first call. Klamp Dep. at 77. As to the content of the second call, Ms. Klamp stated: "I just remember he was looking for Sandy and that it seemed to be that it was

---

[23] Although Ms. Klamp testified that Mr. Wood called her "at work," his notes reflect that he called her cell phone number, as listed on the "For Rent" sign, and the evidence in the record does not disclose any plausible way that Mr. Wood could have known Ms. Klamp's work phone number. *See* Klamp Dep. at 134. Notably, January 17, 2011, was a Monday, and Mr. Wood's electronic notes reflect that the call was made at around 3:00 p.m. Thus, Ms. Klamp likely received the call while she was at work, and may simply not recall accurately the phone on which she received the call. In any event, this minor discrepancy does not create a dispute of material fact.

in reference to the property. . . ." *Id.* at 77-78. She could not recall whether Mr. Wood told her why he was trying to locate Ms. Webb. *Id.* at 78-79.

Of course, Ms. Klamp and Mr. Wood are the only people with direct knowledge of the number and content of any phone conversations between them. Ms. Klamp's memory was somewhat vague, especially as to the second call. Arguably, Ms. Webb's recollection of what Ms. Klamp told her at the time about the content of the call might be admissible under an exception to the rule against hearsay (or might refresh Ms. Klamp's recollection if it was provided to her). Even accepting that proposition, however, Ms. Webb's testimony on this point is insufficient to generate a genuine factual dispute. At her deposition, Ms. Webb stated:

> [Mr. Wood] started calling [Ms. Klamp] at work. She was upset. He called her at work on the first day it was no big deal. She took a message, sent me his number. The second day she took a message, sent me his number. The third day she was getting pissy about it. The people at work thought she was getting collection calls because she was behind on bills.

Webb Dep. at 132. Even assuming that there were three calls, as Ms. Webb alleges, nothing in the above-quoted testimony is indicative of the actual content of anything Mr. Wood supposedly said to Ms. Klamp.

On Friday, January 21, 2011, Ms. Webb sent Ms. Klamp an email stating, in relevant part, ECF 74-9:

> I wanted to put what we discussed into writing to make sure we both know what to expect. . . . I will continue to attempt to rent the unit, but as you have seen the bulk of phone calls are not serious renters . . . . What we have agreed is that you will not be held responsible for the rent until the end of the lease but instead will pay February rent and forfeit the security deposit. You will move out by the end of February and turn over the keys. In return, I will forgive whatever rent I am entitled to under the remainder of the lease that goes through 8/30/11.

The email does not mention the underlying reason for the early termination of the Lease, or the reason why the email was sent at that particular juncture. At her deposition, Ms. Webb testified, Webb Dep. at 131-33:

> [A]t that point I had decided that this was the best move. . . . At this point I had gotten pretty behind on my mortgage and I had been in a pretty heated debate about having a tenant in the home with Ernie from Green Tree, he had made his opinion on this very known to me that he thought it was horrible that I had a tenant in the home. He hated it . . . . And at that point between what she was telling me that this guy was calling her at work and the conversations I was having with this guy who had told me his opinion about having a renter in the house I knew there was no way that this was going to deescalate. So at that point she had been pushing for it all along, renters weren't coming along and I just told her, hey, let's just, if that's still what you want to do let's do it because I knew things were going to get worse. . . . So I finally caved in to her, saying, go ahead, just leave.

In contrast, Ms. Klamp testified, as noted, that she and Ms. Webb had had a "[f]irm agreement" since December that, if no renter had been found by March 1, Ms. Klamp would be released from the Lease. Klamp Dep. at 135.

In the interim, the initial report from the Five Brothers site inspection that the Property was vacant had automatically triggered a computer generated request to Five Brothers to conduct a somewhat more thorough "exterior inspection." An employee or contractor for Five Brothers performed this inspection on January 20, 2011, completing a report on a more detailed form than the previous inspection. *See* Inspection Report 1/20/11 (ECF 75-20 at 1).[24] The inspector again reported that the "Property is vacant" and noted the "For rent sign" with Ms. Klamp's phone number. *Id.* The inspector also noted that the vacancy of the property was "Verified By: VISUAL"; that the Property was secure; that the status of the utilities was unknown; that there

_____

[24] Again, the record does not reveal the identity of the person who conducted the inspection.

was "No personal property prese[nt]"; that there were no visible exterior damages; and that the inspector did not have an "Interior View." *Id.* Notably, none of plaintiff's causes of action arise from either this inspection or the previous inspection that occurred on January 10, 2011.

The results of the second inspection were received electronically in Green Tree's records on January 25, 2011. *See* Green Tree Account Notes at 11. The electronic record stated: Property is vacant. For rent sign [Klamp's phone number]." *Id.* Later that day, Lorna Agravante, a Green Tree employee, emailed Mr. Wood, asking him to "advise of any account level reason **NOT** to approve [Ms. Webb's account] for Re-Key/Winterization." ECF 75-15 at 6 (bold and capitals in original). Mr. Wood replied: "approve." *Id.* The same day, Ms. Agravante entered into Green Tree's electronic record for Ms. Webb's account the following directive to Five Brothers: "RE-KEY ORDERED…….Please secure according to FNMA guidelines and if over the allowable, please bid." Green Tree Account Notes at 11 (ellipsis in original).

According to Christina Hankey, the Operations Manager for Five Brothers, Five Brothers received an "initial secure order" for the Property from Green Tree. Deposition of Christina Hankey at 10, 24 ("Hankey Dep.").[25] According to Ms. Hankey, an "initial secure" entails the following steps, *id.* at 24:

> [I]n accordance with Fannie Mae guidelines . . . complete a lock change, secure the property. If it has a broken window, Fannie Mae requires that window be boarded. If there is a pool in the yard, . . . the pool must be secured or if there is a fence around the pool, the fence itself must be secured. The grass must be cut if it's within Fannie Mae's grass cutting season and/or the property winterized if it's within Fannie Mae's winterization season. They have to cap any exposed wires or gas lines, . . . remove any hazards that are in the property, submit a bid for any damages that are required to be cured in accordance with Fannie Mae regulations.

---

[25] Excerpts from the transcript of Ms. Hankey's deposition are contained in ECF 74-14 and ECF 75-10.

Daniel Van Keuren, an employee of Green Tree, also discussed the process of initially securing a property.  *See* Deposition of Daniel Van Keuren at 10-11 ("Van Keuren Dep.").[26]  At his deposition, he stated, *id.*: "[Five Brothers] would first confirm vacancy.  Then . . . per Fannie Mae guidelines, they would re-key the property through a secondary access point, either a rear or side door, leaving the front door available . . . to the homeowner."  Mr. Van Keuren stated that it would not be appropriate to re-key a property if it was discovered that the property was occupied.  *Id.* at 12.  According to Van Keuren, it is the responsibility of Five Brothers to determine whether a property is occupied or vacant.  *Id.* at 13-14.

When Five Brothers received the initial secure order for the Property, it contacted one of its independent contractors in the Grasonville area, Dean O'Donnell, to secure the Property.  Hankey Dep. at 24.  At the time, Mr. O'Donnell was the proprietor of a landscaping and lawn care business operating under the name 3D Lawn Care.  Deposition of Dean O'Donnell at 9 ("O'Donnell Dep.").[27]  O'Donnell had performed a number of lawn mowing jobs for Five Brothers, *id.* at 10-11, but had never previously secured a property.  *Id.* at 15.  According to O'Donnell, Five Brothers "asked [him] if he was interested in securing a foreclosed home," *i.e.*, the Property, and he "told them [he] would go look at it and get back to them."  *Id.*

Coincidentally, Mr. O'Donnell's cousin, Mark Thomas, runs an automotive service shop that is located across the street from the Property.  *Id.* at 16; *see also* Deposition of Mark Thomas

---

[26] Excerpts from the transcript of Mr. Van Keuren's deposition are contained in ECF 74-13 and ECF 75-17.  Neither side submitted the initial pages of the deposition transcript, in which Mr. Van Keuren presumably described his exact position with Green Tree.

[27] Excerpts from the transcript of Mr. O'Donnell's deposition are contained in ECF 74-16, ECF 75-6, and ECF 77-8.

at 51 ("Thomas Dep.").[28]  Mr. O'Donnell drove to the Property on January 27, 2011, to determine "whether or not [he] wanted it and/or give [Five Brothers] a price to do the job." O'Donnell Dep. at 39.  He "initially told [Five Brothers] that [he] was interested, but [he] couldn't tell them anything until [he had] seen what was entailed."  *Id.*  So, he went to the Property "with the intention[ ] of giving [Five Brothers] an estimate on securing the property." *Id.*; *see also* Thomas Dep. at 51.

When O'Donnell arrived on the street, it was unclear to him "which house exactly was the house [he] was supposed to be looking at," because the mailboxes to several houses on the street were all placed together, away from the houses.  *Id.* at 16.  So, he went across the street to his cousin's service station to "ask [Mr. Thomas] if he knew which house was which."  *Id.*; *see also* Thomas Dep. at 51-52.  Mr. Thomas knew both Ms. Webb and Ms. Klamp.  Indeed, he and Ms. Klamp worked out at the same gym.  Thomas Dep. at 37.[29]  When Mr. Thomas realized that the house Mr. O'Donnell had been asked to secure was Ms. Webb's, he told his cousin: "I don't think that would be a foreclosure, knowing Sandy Webb.  She's not going to let something go into foreclosure. . . .  I think you've got something wrong here, because I know that's Sandy's house, and I think you got the wrong house."  *Id.* at 52-53.

[28] Excerpts from the transcript of Mr. Thomas's deposition are contained in ECF 74-7, ECF 75-12, and ECF 77-7.

[29] Mr. Thomas testified that he had run into Ms. Klamp at the gym shortly after she and Mr. Miller broke up, and Ms. Klamp informed him about her situation with regard to the breakup and the Property.  Thomas Dep. at 37-38.  According to Mr. Thomas, Ms. Klamp informed him that she was looking to find someone else to rent the Property, *id.* at 38-39, and that "Christina said that she could get out of her contract . . . at around March, that she would be let out in March regardless [of] whether she found someone to take over or not, March of 2011."  *Id.* at 39. Mr. Thomas believed that this conversation with Ms. Klamp had taken place in November 2010, before Thanksgiving.  *Id.* at 37-38, 41.  Given Ms. Klamp's testimony regarding the timing of the end of her relationship with Mr. Miller, it is likely that Mr. Thomas did not accurately recall the date.  In any event, this discrepancy does not create a dispute of material fact.

Nevertheless, O'Donnell looked in the front window of the Property to determine whether it was occupied. According to O'Donnell, the Property "looked to be vacant." O'Donnell Dep. at 31. Mr. O'Donnell recalled that there were "one or two small pieces of furniture that [he] could see from one window that [he] looked through," but he "didn't do a lot of poking." *Id.* at 17-18. He did not look through any windows other than the front window, enter the home, or take any pictures. *Id.* at 34. He did not walk to the back of the Property and did not open any gates. *Id.* at 32. Moreover, O'Donnell testified that, to the extent that he had gone on the Property and looked in the window, it was not at Five Brothers' instruction but of his own volition, as part of his determination of whether he was interested in the job. *Id.* at 44-45.

Mr. Thomas and Mr. O'Donnell telephoned Webb from Mr. Thomas's office at the shop. Thomas Dep. at 53. They both spoke with Ms. Webb. She "was surprised" and told Mr. Thomas, "don't let him touch that house." *Id.* According to Mr. O'Donnell, Ms. Webb asked him if he had looked through the windows and he said that he had, in order to determine whether the house was occupied. O'Donnell Dep. at 16-17. Ms. Webb also informed the cousins that "there must be a mistake and . . . that she would look into the matter and get it straight." Thomas Dep. at 54.

Accordingly, Mr. Thomas "didn't let" Mr. O'Donnell secure the Property. *Id.* at 53. Mr. Thomas testified: "I told Dean not to do it, don't mess with it," and O'Donnell responded, "whatever you say. He said, I think I'll stay away from it." Thomas Dep. at 55. O'Donnell "decided [he] didn't want anything to do with the job," O'Donnell Dep. at 16, drove away, *see* Thomas Dep. at 55, and did not return to the Property. O'Donnell Dep. at 29. Thereafter, O'Donnell informed Five Brothers that he "wasn't interested in the job." *Id.* at 15.

Both Mr. Thomas and Mr. O'Donnell testified unequivocally that Ms. Klamp was not at the Property that day and that they did not speak with her in person or by telephone. *See* Thomas Dep. at 53-55; O'Donnell Dep. at 18, 32, 40. Ms. Klamp also testified that she was not at the Property and "never saw anybody" in person at the Property. Klamp Dep. at 85. In contrast to Mr. Thomas and Mr. O'Donnell, she testified that she had a "vague memory" that Mr. Thomas had called her that day, but she also insisted repeatedly that she did not remember this accurately. *Id.* at 81-84. Moreover, Ms. Klamp testified that, although her father had helped her show the Property to prospective renters at various times, she did not "remember him being involved with Green Tree or Five Brothers or any of that component to it at all." *Id.* at 140; *see id.* at 133-34.

The following colloquy from Ms. Klamp's deposition is pertinent, *id.* at 138-140:

[Counsel for Five Brothers]. . . . Did you have any idea or come to learn as to why Green Tree or Five Brothers was inquiring at all?

A. No. I didn't really know what was going on.

Q. Did you ever come to find out what was going on?

A. . . . [T]he only thing I was told was there was a mistake made. They were pursuing the house and shouldn't have been pursuing the house. There was no reason why they should have been pursuing that house. That's . . . the impression I was under.

Q. And who gave you that impression?

A. Sandy. Ms. Webb. . . .

Q. No one from Green Tree or Five Brothers gave you that information about why they were stopping by the property or inquiring as to Sandy's contact information?

A. No, I didn't learn that from Green Tree or Five Brothers. No. It was— Sandy informed me about everything.

Q. Were you ever intimidated at all by Green Tree or Five Brothers or any of their employees or agents?

A. Not at all.

Q. Were you ever scared at all?

A.      No, I was never scared.

                              *      *      *

Q.      . . . Did any of this ordeal with Green Tree or Five Brothers have any
        bearing at all on your decision to move out of that residence?

A.      No.  I would have moved out whether they—no matter what they said. . . .
        I had chosen before any of their involvement that I wanted to get out of
        the house.[30]

Green Tree's electronic records reflect that Ms. Webb called Green Tree on January 27,

2011, shortly after 4:00 p.m., and spoke with an employee other than Mr. Wood.  The notes from

that call (as interpreted by Mr. Wood) state, Wood Dep. at 34; *see also* Green Tree Account

Notes at 10:

        Talked to app.  MS said someone from Five Brothers had been at home and said
        they would rekey home even though home is currently occupied with tenants.
        Told MS Green Tree could rekey home if home was occupied.  Told MS would
        forward E/ [Wood did not know what "E/" meant] to [supervisor] to be sure [that]
        . . . wouldn't happen.  Emailed JDP.

The next entry in the electronic record was made later that day by a user with the initials

JDP, and stated: "Management Review . . . Emailed FNMA Prop to make sure home is not

rekeyed…renters [live in house]."  Green Tree Account Notes at 10 (capitalization altered).  At

about 7:00 p.m. that day, the electronic record reflects another call received from Ms. Webb.

The notes state, Wood Dep. at 33-34; *see also* Green Tree Account Notes at 10:

        Inbound from Sandy wanting to know if this was taken care of.  Said renter is
        freaking out and not wanting to leave her home for fear she will come back to a

_____

        [30] Plaintiff has submitted an unauthenticated copy of what appears to be a page from her
cell phone call records, reflecting that she received an incoming call from Ms. Klamp's cell
phone on January 27, 2010, which lasted for seven minutes, after which she exchanged phone
calls with a number that she states is Mr. O'Donnell's.  Thus, she suggests that Ms. Klamp, Mr.
O'Donnell, and Mr. Thomas are mistaken in their recollections and that she learned that Mr.
O'Donnell was at the Property from Ms. Klamp.  Even assuming that this record can support
plaintiff's claim, there is no dispute that Ms. Klamp was not at the Property on January 27, 2010.

cleared-out home.  Advised her have requested the rekey to be cancelled.  She will follow up tomorrow.

The parties agree that the Property was not re-keyed.  On or about February 28, 2011, Ms. Klamp concluded her tenancy and removed her remaining possessions (and Mr. Miller's) from the Property.  *See* ECF 75-13 at 1.  On that date, Ms. Webb provided Klamp with a letter of reference, which stated, among other things: "While Christina had a year lease and sought to end the lease early due to an extraordinary personal situation, she left on good terms because she fulfilled her contractual obligations to terminate early."  Ex.I to Motion (ECF 74-10).  When asked at her deposition about the "extraordinary personal situation" to which Ms. Webb referred, Ms. Klamp testified that this phrase referred to her breakup with Mr. Miller.  And, she unequivocally stated that her breakup with Mr. Miller was the only reason that she sought to end the Lease early.  Klamp Dep. at 127.

Additional facts will be included in the Discussion.

## Discussion

### A.  Summary Judgment Standard

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  A fact is "material" if it "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In resolving a summary judgment motion, the court must view all of the facts, including reasonable inferences to be drawn from them, in the light most favorable to the non-moving party.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *News*

*and Observer Publishing Co. v. Raleigh-Durham Airport Auth.*, 597 F.3d 570, 576 (4th Cir. 2010); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002). "A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [its] pleadings,' but rather must 'set forth specific facts'" showing that there is a triable issue. *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004). *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986). The "judge's function" in reviewing a motion for summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 249. If "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," there is a dispute of material fact that precludes summary judgment. *Id.* at 248.

When, as here, the parties have filed cross-motions for summary judgment, the court must consider "each motion separately on its own merits 'to determine whether either of the parties deserves judgment as a matter of law.'" *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir.) (citation omitted), *cert. denied*, 540 U.S. 822 (2003). "Both motions must be denied if the court finds that there is a genuine issue of material fact. But if there is no genuine issue and one or the other party is entitled to prevail as a matter of law, the court will render judgment." 10A WRIGHT, MILLER & KANE, FEDERAL PRACTICE & PROCEDURE § 2720, at 336-37 (3d ed. 1998, 2012 Supp.).

## B. Evidentiary Matters

Before discussing the merits of the parties' arguments, I must resolve some disputes between the parties concerning what evidence is properly before the Court.

Green Tree maintains that plaintiff must be deemed to have admitted the truth of several contentions that, in its view, fatally undermine certain of her claims, because she failed to respond timely to Green Tree's "First Set of Request[s] for Admission of Facts and Genuineness of Documents" ("Request for Admissions"), a copy of which it submitted as Exhibit 1 to the Green Tree Reply (ECF 79-1).[31]  Plaintiff does not agree that the Court should accept as admitted the contentions in the Request for Admissions.  *See* Webb Reply at 1-3.  Green Tree moved for leave to file a Surreply (ECF 85, ECF 85-1) regarding the dispute over the Request for Admissions, and plaintiff filed a Response to Surreply (ECF 86).[32]

In addition, Green Tree filed a Motion to Strike (ECF 78), asserting that I should not consider several averments in a declaration filed by Ms. Webb on grounds of lack of relevance and/or hearsay.  It also contends that several other documentary exhibits submitted by plaintiff should be disregarded on the same grounds and/or because they have not been properly authenticated.  Plaintiff filed an opposition to the Motion to Strike, *see* Strike Opposition (ECF 83); Green Tree filed a reply, *see* Strike Reply (ECF 84); plaintiff filed a single-paragraph surreply, *see* Strike Surreply (ECF 87-1), accompanied by a motion for leave to file it (ECF 87); and Green Tree filed an opposition, *see* Strike Surreply Opposition (ECF 88).[33]  I address these matters in sequence.

---

[31] Because the deadline for plaintiff to respond to the Request for Admissions had not elapsed when the Motion and the Cross-Motion were filed, the issues regarding the Request for Admissions were first raised in the Green Tree Reply.

[32] Leave of court is necessary to file a surreply.  *See* Local Rule 105.2(a).  I will grant the motion for leave to file the Surreply (ECF 85).  Green Tree moved to strike plaintiff's Response to Surreply (ECF 89).  That motion will be denied.

[33] I will grant plaintiff's motion for leave to file the Strike Surreply (ECF 87).  However, I have also considered the arguments in the Strike Surreply Opposition.

### 1. Request for Admissions

Requests for admissions are a discovery device governed by Rule 36 of the Federal Rules of Civil Procedure. Rule 36(a) provides:

> A party may serve on any other party a written request to admit, for purposes of the pending action only, the truth of any matters within the scope of Rule 26(b)(1)[34] relating to:
>
>> (A) facts, the application of law to fact, or opinions about either; and
>>
>> (B) the genuineness of any described documents.

In response to a request for an admission, the answering party must either admit the matter requested or, "[i]f a matter is not admitted, . . . specifically deny it or state in detail why the answering party cannot truthfully admit or deny it." Fed. R. Civ. P. 36(a)(4). Moreover, the rule allows a party to admit a matter in part and deny it in part or plead a lack of knowledge or information under certain circumstances. *See id.*

The effect of an admission is specified in Fed. R. Civ. P. 36(b):

> A matter admitted under this rule is conclusively established unless the court, on motion, permits the admission to be withdrawn or amended. Subject to Rule

---

[34] Fed. R. Civ. P. 26(b)(1) establishes the scope of civil discovery in a federal action. It provides:

> Unless otherwise limited by court order, the scope of discovery is as follows: Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense—including the existence, description, nature, custody, condition, and location of any documents or other tangible things and the identity and location of persons who know of any discoverable matter. For good cause, the court may order discovery of any matter relevant to the subject matter involved in the action. Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence. All discovery is subject to the limitations imposed by Rule 26(b)(2)(C) [which authorizes the court to limit discovery on the basis of redundancy, availability from another source or prior opportunity, or cost/benefit considerations].

16(e),[35] the court may permit withdrawal or amendment if it would promote the presentation of the merits of the action and if the court is not persuaded that it would prejudice the requesting party in maintaining or defending the action on the merits. An admission under this rule is not an admission for any other purpose and cannot be used against the party in any other proceeding.

Of import here, Rule 36(a)(3) establishes the time to respond to a request for admissions and the consequence of an untimely response:

A matter is admitted unless, within 30 days after being served, the party to whom the request is directed serves on the requesting party a written answer or objection addressed to the matter and signed by the party or its attorney. A shorter or longer time for responding may . . . be ordered by the court.[36]

In its Request for Admissions, Green Tree asked plaintiff to admit several background facts and the authenticity of a number of documents. However, it also asked for admissions that go to the heart of the merits of some of plaintiff's claims. For instance, it asked plaintiff to admit that she made her mortgage payment for October 2009 on October 15, 2009, and that servicing rights for the mortgage were assigned to Green Tree on November 1, 2009. *See* Request for Admissions No. 8, 9. If admitted, those contentions would tend to show that plaintiff's mortgage was not in default when it was assigned to Green Tree, in turn indicating that Green Treen is exempt from liability under the FDCPA as a "debt collector" with respect to plaintiff's mortgage. Similarly, Green Tree asked plaintiff to admit that her tenant was neither residing nor present at the Property on January 27, 2011; that the tenant had no communications with Green Tree or Five Brothers on that date; and that the tenant asked to be released from her lease before January 1, 2011, for personal reasons unconnected to the "acts of Green Tree or Five Brothers." Request

---

[35] Fed. R. Civ. P. 16(e) provides that a court "may modify the [pretrial] order issued after a final pretrial conference only to prevent manifest injustice."

[36] Rule 36(a)(3) also allows the parties to stipulate among themselves to a shorter or longer time for responding to a request for admission. That provision is not relevant here.

for Admissions No. 16, 18, 19, 21-25. If admitted, those contentions would undermine plaintiff's claim for tortious interference with a business relationship.

According to Green Tree's certificate of service, on November 7, 2012, Green Tree transmitted its Request for Admissions to plaintiff by first-class mail, addressed to plaintiff's then-current address of record. *See* Request for Admissions at 8; *see also* ECF 79-1 at 37 (cover letter for Request for Admissions, also dated Nov. 7, 2012). In addition to the certificate of service, one of Green Tree's attorneys, John Y. Lee, has filed a declaration, under penalty of perjury, asserting that he caused the Request for Admissions to be mailed to plaintiff on November 7, 2012. *See* Ex.C to Surreply (ECF 85-1 at 20). The thirtieth day after November 7 was Friday, December 7, 2012. Because the time for a response under Fed. R. Civ. P. 36(a)(3) is triggered by service on the answering party, and because plaintiff was served with the Request for Admissions via first-class mail, the time to respond was extended three days by operation of Fed. R. Civ. P. 6(d). Accordingly, based on the date of service certified by Green Tree's counsel, plaintiff was obligated to respond to the Request for Admissions no later than Monday, December 10, 2012.

Plaintiff sent Green Tree a response to the Request for Admissions, in which she denied some of the substantive requests for admission discussed above.[37] However, Green Tree contends that plaintiff's response was not timely served and therefore all of the contentions in Green Tree's Request for Admissions are deemed admitted in their entirety, pursuant to Fed. R. Civ. P. 36(a)(3).

---

[37] Neither party has filed a signed copy of plaintiff's response to the Request for Admissions. However, Green Tree has submitted an unsigned copy of the response, which plaintiff emailed to it. *See* Ex.B to Surreply (ECF 85-1 at 13). Neither party appears to contend that there is any discrepancy between the unsigned copy and the signed copy.

The certificate of service on plaintiff's response states that the response was mailed to Green Tree on December 7, 2012, which would have been timely. *See* Fed. R. Civ. P. 5(b)(2)(C) (providing that, when a paper is served by mail, "service is complete upon mailing"). However, Green Tree has submitted a copy of the envelope in which the response was contained, *see* Ex.2 to Green Tree Reply (ECF 79-2), which contains a postmark dated December 14, 2012, in Portland, Oregon.[38] Moreover, Green Tree asserts that it did not receive the response until December 17, 2012, which it posits is "consistent" with plaintiff having mailed the response on December 14. Green Tree Reply at 7 n.7. In addition, plaintiff sent Green Tree's counsel an unsigned courtesy copy of her response via email. However, the email was sent on December 13, 2012, *see* Ex.B to Surreply (ECF 85-1 at 11), which still would have been untimely.[39]

Plaintiff presents both factual and legal responses to Green Tree's arguments. As a factual matter, plaintiff asserts that her response was not untimely for two reasons: (1) because the Request for Admissions was not served on November 7, 2012, and (2) because she served her response on December 7, 2012.

As to the first reason, plaintiff claims that she did not actually receive the Request for Admissions until November 14, 2012. In an email sent to Green Tree's counsel, Mr. Lee, on the afternoon of November 14, 2012, plaintiff said: "Can you send the admissions request via email in Word. My husband said they just arrived at the house and since we have already lost a week, I

---

[38] The envelope also contains a postage stamp generated by a digital postage meter, which also includes a date. The exact date of the postage is not clearly legible, but it is a date in November 2012. Because neither side contends that the response was mailed in November 2012, I will disregard this date.

[39] Green Tree also notes that the courtesy copy of the response is not valid because it was not signed, and that service by email is effective only if the recipient "consented in writing" to accept service by email, Fed. R. Civ. P. 5(b)(2)(E), which Green Tree contends it did not do. *See* Surreply at 2 n.2.

want to at least get a peak [sic] at them and start responding." Ex.A to Webb Reply (ECF 80-1 at 5). Mr. Lee emailed plaintiff an electronic copy of the Request for Admissions later that day, saying: "As a courtesy, I will provide them." *Id.* Plaintiff suggests that the Request for Admissions was "most likely served well after the [November 7, 2012] deadline for request for admissions in the scheduling order." Webb Reply at 2.[40] She also faults Green Tree for not providing the Court with a copy of the postmarked envelope in which it sent the Request for Admissions although, as Green Tree points out, that envelope is in plaintiff's possession, not Green Tree's.

As to the second reason, plaintiff asserts that she mailed her response to the Request for Admissions on December 7, 2012, by placing it in a mailbox in Washington County, Oregon— not Multnomah County, where Portland is situated. Webb Reply at 2 n.1. She hypothesizes that a postal "processing center" in Portland "must have stamped [the postmark on the response] days later after some sort of delay that was no fault of Plaintiff." *Id.* She posits, moreover, that "if the evidence of the cover letter and certification [for the Request for Admissions] from the defendant is enough for their proof of date sent then it should also be sufficient evidence for plaintiff to attest in a certification that admissions were sent on a date certain." *Id.* at 1.[41]

---

[40] Plaintiff states that she did not "protest the late serving of the Request for Admissions due to Hurricane Sandy [which made landfall on the eastern seaboard on or about October 29, 2012], assuming that a delay in delivery could have been caused by the electricity and other logistical nightmares caused on the east coast by the storm." Webb Reply at 2 n.1. She also protests that Green Tree sent the Request for Admissions to "an address known to be slow," *id.* at 2. However, the address to which Green Tree sent the Request for Admissions was plaintiff's address of record.

[41] In light of this argument, it is noteworthy that plaintiff has not actually provided a signed certificate or sworn declaration as to the date on which her response was sent. It is also notable that, in her email of December 13, 2012, transmitting the unsigned courtesy copy of her response, she stated: "Just in case the mail is taking as long as it did to get to my house from

Plaintiff's factual argument is less than convincing, especially in light of the cavalier approach that it appears she has taken to accurate portrayal of the facts underlying her substantive claims. I need not resolve the factual dispute as to when the Request for Admissions and its response were served, however, because I am persuaded by plaintiff's legal argument: even if the response was served four days late, Green Tree suffered no prejudice.

Although Fed. R. Civ. P. 36(a)(3) provides that requests for admissions are deemed admitted if not timely answered, the Fourth Circuit has clearly stated that a district court is nevertheless vested with discretion "not to deem the requests for admission as admitted." *Nguyen v. CNA Corp.*, 44 F.3d 234, 242 (4th Cir. 1995). In *Nguyen*, the Court held that "the district court did not abuse its discretion in refusing to consider the requests for admission as admitted," where the response was "filed one day late," because "the late response was so minimal in time and work on the date for responding was slowed by [a] snow storm." *Id.* at 243.

Here, no cognizable prejudice inured to Green Tree from plaintiff's late filing. As noted, the response to the Request for Admissions was not due until after Green Tree filed its summary judgment Motion, and so even if the response was timely, Green Tree could not have addressed it in the Motion. Moreover, Green Tree's reply to plaintiff's Cross-Motion was not due until December 20, 2013,[42] nearly a week after plaintiff's response was served and a full week after Green Tree had received the courtesy copy by email.

The "'failure to respond in a timely fashion'" to a request for admissions "'does not require the court automatically to deem all matters admitted,'" *United States v. Petroff-Kline*,

your office, here is the unsigned answer I sent last week." Ex.B to Surreply (ECF 85-1 at 11).

[42] The Cross-Motion was filed on Monday, December 3, 2012, and by operation of Local Rule 105.2(a) and Fed. R. Civ. P. 6(d), Green Tree's reply was due seventeen days later, on Thursday, December 20, 2012. It was filed on that date.

557 F.3d 285, 293 (6th Cir. 2009) (citation omitted), and a district court may "accept 'the filing of an answer that would otherwise be untimely.'" *Id.* (citation omitted). "The court may permit . . . withdrawal or amendment [of deemed admissions] 'when [1] the presentation of the merits of the action will be subserved thereby and [2] the party who obtained the admission fails to satisfy the court that withdrawal or amendment will prejudice that party in maintaining the action or defense on the merits.'" *Raiser v. Utah County*, 409 F.3d 1243, 1246 (10th Cir. 2005)) (citation omitted) (brackets in original). Indeed, Fed. R. Civ. P. 36(b) expressly permits withdrawal of admissions on the basis discussed in *Raiser*.

Green Tree protests that Rule 36(b) permits admissions to be withdrawn "on motion," and that plaintiff has not filed such a motion. However, "a formal motion is not always required. Instead, a withdrawal 'may be imputed from a party's actions' . . . ." *Petroff-Kline*, 557 F.3d at 293 (internal citations omitted). Plaintiff has timely and unequivocally made clear that she does not intend to admit wholesale the contentions in Green Tree's Request for Admissions. In light of the Fourth Circuit's "strong policy that cases be decided on their merits," *United States v. Shaffer Equip. Co.*, 11 F.3d 450, 453 (4th Cir. 1993), I exercise my discretion not to rely on plaintiff's deemed admissions to the contentions in Green Tree's Request for Admissions in resolving the pending motions.

### 2. *Hearsay, Relevance, and Authentication*

As noted, Green Tree challenges the admissibility of several of plaintiff's evidentiary submissions. In the context of summary judgment motions, Fed. R. Civ. P. 56(c) provides that each side must support its factual assertions with citation to "particular parts of materials in the record," Fed. R. Civ. P. 56(c)(1)(A), and that a party may object that material cited by the other

side cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). Thus, although at the summary judgment stage a party does not necessarily need to "produce evidence in a form that would be admissible at trial," *Celotex*, *supra*, 477 U.S. at 324, when the opposing party objects on admissibility grounds, "[t]he burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated." Fed. R. Civ. P. 56, Adv. Cmte. Notes, 2010 Amendments. Green Tree's evidentiary challenges pertain to relevance, hearsay, and authentication.

Under Rule 402 of the Federal Rules of Evidence, "[r]elevant evidence is admissible" unless rendered inadmissible pursuant to some other particular legal provision, and "[i]rrelevant evidence is not admissible." "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401. These evidentiary relevance "principles apply to summary judgment motions." *Ziskie v. Mineta*, 547 F.3d 220, 225 (4th Cir. 2008).

Hearsay is defined by Rule 801(c) of the Federal Rules of Evidence. It is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." *Id.* Hearsay is "not admissible," absent a rule of evidence or other statute or rule that renders it admissible. Fed. R. Evid. 802. However, out of court statements are "not hearsay" if they are "not offered 'to prove the truth of the matter asserted.'" *United States v. Vidacak*, 553 F.3d 344, 352 (4th Cir. 2009) (quoting Fed. R. Evid. 801(c)). Moreover, there are several exceptions to the rule against hearsay, whereby an out of court statement may be offered to prove the truth of the matter asserted. *See* Fed. R. Evid. 801(d), 803, 804. But, it is well settled that "hearsay evidence, which is inadmissible at trial,

cannot be considered on a motion for summary judgment." *Md. Highways Contractors Ass'n v. Maryland*, 933 F.2d 1246, 1251 (4th Cir. 1991); *accord Barnes v. Montgomery County*, 798 F. Supp. 2d 688, 691 (D. Md. 2011) ("[H]earsay statements . . . cannot support or defeat a motion for summary judgment.").

Fed. R. Evid. 901 governs authentication of documentary or tangible evidence. It provides that the proponent of an "item of evidence" must "produce evidence sufficient to support a finding that the item is what the proponent claims it is," Fed. R. Evid. 901(a)—for instance, competent "[t]estimony that an item is what it is claimed to be," Fed. R. Evid. 901(b)(1), or the "appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances." Fed. R. Evid. 901(b)(4). "It is well established that . . . unauthenticated documents cannot be considered on a motion for summary judgment." *Orsi v. Kirkwood*, 999 F.2d 86, 92 (4th Cir. 1993).

Both authentication and hearsay are related to the concept of testimonial competence. Under Fed. R. Evid. 602, a witness who is not offering expert opinion testimony "may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." An "affidavit or declaration used to support or oppose a motion [for summary judgment] must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). *See In re French*, 499 F.3d 345, 358 (4th Cir. 2007) (describing requirements of former Rule 56(e), now codified without substantive change in Rule 56(c)(4), as "mandatory"). It "is a failure of substance, not merely one of form, for a party to file

a summary judgment affidavit which is based on anything other than personal knowledge." *Malina v. Baltimore Gas & Elec. Co.*, 18 F. Supp. 2d 596, 604 n.4 (D. Md. 1998).

Notably, although Rule 56(c)(2) permits a party to object to the presentation of inadmissible evidence at the summary judgment stage, "[t]here is no need to make a separate motion to strike." Fed. R. Civ. P. 56, Adv. Cmte. Notes, 2010 Amendments. In response to a well founded objection, a court will simply disregard the challenged evidence. Accordingly, Green Tree's Strike Motion will be denied, as unnecessary. Nevertheless, I have carefully considered all of Green Tree's evidentiary challenges and plaintiff's arguments in response. Many (although not all) of Green Tree's challenges are meritorious. However, I have assumed, *arguendo*, that all of the documentary evidence submitted by plaintiff is admissible and I have considered it. Admissible or not, none of the evidence submitted by plaintiff is sufficient to generate a genuine dispute of material fact or demonstrate that she is entitled to judgment in her favor as a matter of law.

### C. Tortious Interference with Business Relationships

The tort of intentional interference with contractual or business relations is "well-established in Maryland." *Macklin v. Robert Logan Assocs.*, 334 Md. 287, 296, 639 A.2d 112, 116 (1994). It "arises only out of the relationships between three parties, the parties to a contract or other economic relationship (P and T) and the interferer (D)." *K & K Mgmt., Inc. v. Lee*, 316 Md. 137, 154, 557 A.2d 965, 973 (1989). The tort has "two general manifestations." *Macklin*, 334 Md. at 297, 639 A.2d at 117. In *Macklin*, the Maryland Court of Appeals explained: "While the two manifestations of the tort share an underlying rationale, *i.e.*, 'under certain circumstances, a party is liable if he interferes with and damages another in his business or

occupation,' they differ in their tolerance of interference." *Id.* at 298, 639 A.2d at 117 (citation omitted).

Under the first scenario, "where a contract between two parties exists, the circumstances in which a third party has a right to interfere with the performance of that contract are more narrowly restricted." *Natural Design, Inc. v. Rouse Co.*, 302 Md. 47, 69, 485 A.2d 663, 674 (1984). Where there is an existing contract that is not terminable at will, "inducing its breach, even for competitive purposes, is itself improper and, consequently, not 'just cause' for damaging another in his or her business." *Macklin*, 334 Md. at 303, 639 A.2d at 120.

A "broader right to interfere with economic relations exists" under the second scenario, "where no contract or a contract terminable at will is involved." *Natural Design*, 302 Md. at 69-70, 485 A.2d at 674. Where there is no existing contract, or the existing contract is "terminable at will by the party who refuses to continue performance," *Macklin*, 334 Md. at 304, 639 A.2d at 120, "there is no legal assurance of future performance; thus a competitor who intentionally causes a third person not to continue an existing contract terminable at will does not improperly interfere with the contractual relation if no wrongful means are employed." *Id.* at 305, 639 A.2d at 121. The Maryland Court of Appeals has provided an illustrative list of "types of wrongful or unlawful acts that could form the basis" for the second manifestation of the tort, including "'violence or intimidation, defamation, injurious falsehood or other fraud, violation of criminal law, and the institution or threat of groundless civil suits or criminal prosecutions in bad faith.'" *Berry & Gould, P.A. v. Berry*, 360 Md. 142, 153, 757 A.2d 108, 113 (2000).

In this case, Ms. Webb and Ms. Klamp had a contract (*i.e.*, the Lease). *See Circuit City Stores, Inc. v. Rockville Pike Joint Venture Ltd. P'ship*, 376 Md. 331, 355, 829 A.2d 976, 989

(2003) ("[A] lease is both a contract and a conveyance of a leasehold estate in land."). The Lease was not terminable at will. *See* Lease. Thus, this case involves the first manifestation of the tort.

The first manifestation of the tort has five elements: (1) the existence of a contract between the plaintiff and a third party; (2) the defendant's knowledge of that contract; (3) the defendant's intentional interference with the contract; (4) breach or termination of the contract by the third party, as a result of the defendant's interference; and (5) damages resulting from the breach or termination of the contract. *See Macklin*, 334 Md. at 301-02, 639 A.2d at 119; *Wilmington Trust Co. v. Clark*, 289 Md. 323, 329, 424 A.2d 744 (1981); *Goldman v. Harford Road Building Ass'n*, 150 Md. 677, 681-82, 133 A. 843 (1926); *Fowler v. Printers II, Inc.*, 89 Md. App. 448, 466, 598 A.2d 794, 802 (1991), *cert. denied*, 325 Md. 619, 602 A.2d 710 (1992); *Lake Shore Investors v. Rite Aid Corp.*, 67 Md. App. 743, 748-49, 509 A.2d 727, 729-30 (1986); *see also Webb I*, 2011 WL 6141464, at *4-8. Intent can be proven "by showing that the defendant intentionally induced the breach or termination of the contract in order to harm the plaintiff or to benefit the defendant at the expense of the plaintiff." *Macklin*, 334 Md. at 301, 639 A.2d at 119.

Green Tree correctly argues that plaintiff's claim fails for three reasons, which I have reordered. In the first place, the tortious conduct that Webb alleged never actually occurred. Plaintiff alleged in her complaint that her tenant was at the Property and discovered a Five Brothers employee peering in the windows and threatening to change the locks and remove her possessions. In the complaint, Webb claimed that Green Tree "harassed" her tenant and "ran the tenant out of the home" with "threats of breaking and entry . . . and actual trespass." Amended Complaint ¶ 19. But, the undisputed material facts show that this never happened. Instead, Ms.

Klamp received two (or, at most, three) phone calls from Mr. Wood, none of which Ms. Klamp perceived as harassment.  No agent of Green Tree or Five Brothers ever threatened Ms. Klamp, over the phone or in person, with breaking and entry or eviction; indeed, aside from the handful of non-harassing calls from Mr. Wood, Ms. Klamp had no dealings at all with representatives of Green Tree or Five Brothers.  Ms. Klamp was not even present at the Property when Mr. O'Donnell was there; while Ms. Klamp continued to have a possessory interest in the Property through February 2011, she had actually vacated the Property in late November 2010.  Even if Klamp had been present, O'Donnell was not there to threaten eviction.

Second, plaintiff cannot show that Green Tree intended to interfere with the Lease.  The undisputed evidence makes abundantly clear that Green Tree did not know, at the time that it directed Five Brothers to secure the Property, that there was a tenant at the Property.  Indeed, Green Tree directed Five Brothers to secure the Property because it appeared to be vacant on two successive exterior inspections.  And, it appeared to be vacant because it was vacant; no one was residing at the Property.  Mr. Wood obtained Ms. Klamp's phone number from the "For Rent" sign and then contacted her.  In that conversation, Klamp described herself to Wood as a former tenant.

In response to these claims, plaintiff has cited communications she had with Mr. Wood in which she notified him that she had tenants at the Property.  But, all of these communications were made in November 2010 at the latest.  Plaintiff has provided no evidence that could support a determination that Green Tree was on notice that Webb still had a tenant residing at the Property *in January 2011*.  To the contrary, every objective indication disclosed in the record that was available to Green Tree at that time pointed in the other direction: the Property appeared

vacant; it had a "For Rent" sign in front of it; and, when contacted by Green Tree, Ms. Klamp described herself as plaintiff's "former tenant."

Last and perhaps most important, it is abundantly clear that Green Tree's conduct did not cause the termination of the Lease. Ms. Klamp testified repeatedly and unequivocally that the sole reason she sought to terminate the Lease was her breakup with Mr. Miller, and that the conduct of Green Tree and Five Brothers played no role whatsoever in her decision.

In the Cross-Motion and in Ms. Webb's deposition testimony, plaintiff articulated a response to this argument: even though Green Tree's conduct did not affect Ms. Klamp's decision to break the Lease, Green Tree's conduct affected *Ms. Webb's* decision to release the tenant. Plaintiff encapsulated this contention at her deposition in the following colloquy with Green Tree's counsel, Webb Dep. at 283-84:

> Q   Ms. Klamp testified that her request and her decision to get out of the lease had nothing to do with the actions of Green Tree and/or Five Brothers. Do you recall that?
>
> A   I agree 100 percent. Her actions didn't. Mine were different. When she first wanted out it was because her boyfriend had cheated on her. I only eventually caved in to her wanting to leave because I knew that at a certain point it was going to get worse and I couldn't sustain what was going on.
>
> Q   But . . . Ms. Klamp's request to get out of the lease had nothing to do with Five Brothers and Green Tree. You would agree with that?
>
> A   It only had to do with my reaction, it did not have to do with her request. Her request started November 28th after she found out her boyfriend was cheating on her. I worked with her but was never going to let her out of the lease without fulfilling her obligations until I knew I couldn't followup [sic] on my part. As a lawyer I knew I had duties and honestly I couldn't stick her with something that I couldn't sustain.

Plaintiff's theory is that the "release was forced upon Plaintiff because she could no longer perform under the contract, without the ability to guarantee or provide quiet enjoyment." Cross-Motion at 8. Plaintiff's argument is creative, although she cites no case law in support of

it. However, I need not determine whether, as a legal matter, a viable claim for tortious interference can be stated for interference that causes the plaintiff to breach its contract with the third party (rather than vice versa). As with the rest of her suit, plaintiff's largest problem is that the undisputed facts stubbornly refuse to support her legal theory.

It was plaintiff who, in an email of December 10, 2010, first suggested to Ms. Klamp that she cut her losses and break the Lease, paying Webb the January rent and foregoing the return of her security deposit. Indeed, plaintiff urged Ms. Klamp to take that option rather than search for a replacement tenant. That offer, which was motivated solely in response to Ms. Klamp's breakup with her boyfriend (who had also resided at the Property), far predated the allegedly tortious conduct of which plaintiff complains. Ms. Klamp also testified that she and Ms. Webb arrived at a firm agreement in December on the terms on which the Lease was ultimately terminated: the tenant would pay rent through February and forfeit her security deposit in exchange for a release from the Lease, unless she found a replacement tenant before that time.

To be sure, Ms. Webb disputes that testimony. According to plaintiff, she and Ms. Klamp did not arrive at their final agreement until January 21, 2011, when plaintiff sent Ms. Klamp an email memorializing the agreement. But, even assuming that the agreement was not finalized until January 21, that email was still sent before Green Tree ordered Five Brothers to secure the Property. The only conduct that Green Tree had undertaken vis-à-vis plaintiff's tenant at that time was, at most, three phone calls to Ms. Klamp that Ms. Klamp did not perceive as harassing and that merely sought contact information for Ms. Webb. As a matter of law, that conduct could not have amounted to tortious interference with the Lease.

Accordingly, for all three reasons (each of which is independently sufficient), Green Tree is entitled to judgment as a matter of law as to Count I.

## D. Breach of Contract and Trespass to Land

Count II and Count III can be considered together, because the gravamen of both counts is that the entry onto the Property, without notice to plaintiff, violated Covenant 7 of the Deed of Trust, which provides in pertinent part:

> Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

Plaintiff claims that the alleged entry on to the Property by Green Tree's agent on January 27, 2011, was unreasonable, due to the agent's alleged threats of eviction, and was an interior inspection without prior notice, because the agent allegedly peered into windows. Accordingly, the entry on to the Property breached Covenant 7 of the Deed of Trust and, by the same token, constituted a trespass.

"'In order to prevail on a cause of action for trespass, the plaintiff must establish: (1) an interference with a possessory interest in his property; (2) through the defendant's physical act or force against that property; (3) which was executed without his consent.'" *Royal Investment Gp., LLC v. Wang*, 183 Md. App. 406, 445, 961 A.2d 665, 688 (2008) (citation omitted), *cert. granted*, 408 Md. 149, 968 A.2d 1064, *appeal dismissed before argument*, 409 Md. 413, 975 A.2d 875 (2009). Plaintiff's theory is that, by causing its agent to enter onto the Property without complying with Covenant 7, Green Tree exceeded the scope of consent contained in the Deed of Trust, thereby satisfying the third element of a trespass claim.

Green Tree responds that Covenant 9, not Covenant 7, of the Deed of Trust controls in this circumstance. Covenant 9 provides, in pertinent part:

> If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument . . . or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable and appropriate to protect Lender's interest in the Property, and rights under this Security Agreement, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. . . . Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building and other code violations or dangerous conditions, and have utilities turned on and off .

In Green Tree's view, plaintiff had breached her duties under the Deed of Trust by failing to make her payments, satisfying condition "(a)" for application of Covenant 9. And, it also appeared to Green Tree that the Property had been abandoned, so as to satisfy condition "(c)." Therefore, Green Tree reasons, Covenant 9 gave it express authority to secure the Property. Green Tree relies on *Paatalo v. J.P. Morgan Chase Bank, N.A.*, Civ. No. 10-119-BLG-CSO, 2012 WL 2505742 (D. Mont. June 28, 2012), in which the court held that an identical provision in a deed of trust authorized a mortgage servicer to enter on the property at issue because the homeowner "had failed to perform his agreement to make the periodic payments required by the Note and Deed of Trust." *Id.* at *10. Moreover, regardless of whether Covenant 7 or Covenant 9 controls, Green Tree argues that it breached neither provision because the alleged entries on the Property were "reasonable" as a matter of law.[43]

---

[43] Green Tree also argues that, under Covenant 7, "Green Tree had ample 'reasonable cause' to enter the Property as a result of Plaintiff's default of her monthly payment obligations and abandonment of the Property." Motion at 22. Although I otherwise largely agree with Green Tree's arguments, this one falls flat. The "reasonable cause" provision of Covenant 7 only applies to interior inspections. And, in order to undertake an interior inspection, the mortgage servicer must both (a) have "reasonable cause," *and* (b) give notice of the interior inspection to the borrower, specifying its reasonable cause. Unless there is an interior inspection

Clearly, a good faith belief that a property has been abandoned triggers a mortgage servicer's right under Covenant 9 to secure the property.[44] Plaintiff has presented some evidence from the deposition testimony of Ms. Hankey of Five Brothers and several Green Tree employees suggesting that the methods used by Green Tree and Five Brothers to determine whether a property is vacant are error-prone and involve little training, oversight, or accountability. But, I decline plaintiff's invitation to turn this suit into a referendum on the broader business methods of Green Tree and Five Brothers. Even if defendant's business methods could, in some hypothetical case, lead Green Tree wrongfully to cause an occupied property to be secured and re-keyed, that did not occur in this case.

In this case, as discussed, several indicators would objectively have suggested to Green Tree that the Property was vacant. Moreover, even if Green Tree's order to secure the Property should not have been issued, the order was never carried out. The Property was never secured or re-keyed, nor was any actual attempt made to do so. The order did not result in a trespass on plaintiff's Property by Green Tree or any arguable breach of any provision of the Deed of Trust. The most that Mr. O'Donnell did was to enter onto the Property and look into the front window

and unless the servicer gives notice to the borrower of the interior inspection, "reasonable cause" is not relevant to whether the servicer's actions are authorized by the Deed of Trust.

[44] Notably, the mortgage servicer in *Paatalo* argued that it was "authorized [under Covenant 9] to enter the property 'if it suspects it has been abandoned.'" *Paatalo*, 2012 WL 2505742, at *10. Although the mortgage servicer pointed to several indicia of abandonment ("no one had been living at the property since January 2010, Plaintiff was behind on his mortgage payments, and an inspector found shutoff notices from the electric company at the property," *id.*), the plaintiff disputed that the property had been abandoned. The *Paatalo* Court concluded that abandonment was immaterial because, as noted, the servicer's entry was authorized by Covenant 9 based solely on the homeowner's failure to make monthly payments. I am not confident that failure to make payments alone would render any and all entries onto the Property—including entry to secure the Property—"reasonable" within the meaning of Covenant 9. However, I need not decide that question in Order to resolve the Motion.

of an empty house. This is no less reasonable than other *de minimis* entries that have been found reasonable under the case law. *See, e.g.*, *Beatty v. BAC Loans Servicing, LP*, Civ. No. RDB-10-2289, 2011 WL 2516394, at *3 (D. Md. June 21, 2011) (holding that "two drive-by inspections" of the plaintiff's property by a mortgage creditor, conducted without notice to plaintiff, were "reasonable" and did not violate identical Covenant 7 in deed of trust); *Moseley v. CitiMortgage, Inc.*, No. C11-5349RJB, 2011 WL 5175598, at *10 (W.D. Wash. Oct. 31, 2011), (holding that servicer's agents did not unreasonably enter property in violation of identical Covenant 7 of deed of trust by "plac[ing] a notice on a doorknob, requesting the [homeowner] to contact [the servicer]").

But, even if O'Donnell's entry was unreasonable, he did not enter onto the Property as Green Tree's agent. Rather, he testified unequivocally that he entered the Property on his own initiative, in order to determine whether he wanted to take the job.[45]

In sum, the undisputed material facts do not disclose an entry onto plaintiff's Property by Green Tree or its agents on January 27, 2011. Even if such an entry had occurred, however, it was clearly authorized under the covenants of the Deed of Trust (regardless of whether Covenant 7 or Covenant 9 governs). Therefore, Green Tree is entitled to judgment as a matter of law as to Count II and Count III.

---

[45] Count II and Count III are focused entirely on the alleged entry onto the Property on January 27, 2011. Plaintiff does not appear to argue that the two previous inspections, on January 10 and 20, 2011, violated any provision of the Deed of Trust. Even if she were to do so now, it is well established that "a plaintiff may not amend her complaint through argument in a brief opposing summary judgment." *Sensormatic Sec. Corp. v. Sensormatic Elecs. Corp.*, 455 F. Supp. 2d 399, 436 (D. Md. 2006).

<u>E. FDCPA</u>

The FDCPA imposes a variety of obligations and potential liabilities on "debt collectors," who are generally defined as entities that "use[ ] any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or [that] regularly collect[ ] or attempt[ ] to collect, directly or indirectly, debts owed or due or asserted to be owed or due to another."  15 U.S.C. § 1692a(6).  In other words, the FDCPA is concerned with "rights for consumers whose debts are placed in the hands of professional debt collectors for collection." *DeSantis v. Computer Credit, Inc.*, 269 F.3d 159, 161 (2d Cir. 2001) (emphasis added).

An entity to which a debt is owed falls outside the definition of "creditor" and qualifies as a "debt collector" only if the entity "receives an assignment or transfer of a debt in default solely for the purpose of facilitating collection of such debt for another," 15 U.S.C. § 1692a(4), or if the "principal purpose" of the entity's business is debt collection. *Id.* § 1692a(6).  So, the FDCPA does not "'apply to creditors collecting debts in their own names and whose primary business is not debt collection,' or to the individual employees of such creditors." *Betskoff v. Enterprise Rent A Car Co.*, Civ. No. ELH-11-2333, 2012 WL 32575, at *5 (D. Md. Jan. 4, 2012) (quoting *Kennedy v. Lendmark Fin. Servs.*, Civ. No. RDB-10-2667, 2011 WL 4351534, at *3 (D. Md. Sept. 15, 2011)); *see also Akpan v. First Premier Bank*, Civ. No. DKC-09-1120, 2010 WL 917886, at *4 (D. Md. Mar. 8, 2010).  Put another way, "[a]n entity that tries to collect money owed to itself is outside the FDCPA." *Carter v. AMC, LLC*, 645 F.3d 840, 842 (7th Cir. 2011).

Moreover, the definition of "debt collector" contains an exemption for an entity, such as a mortgage servicer, that collects debts that were "not in default at the time [they were] obtained"

by the entity.  15 U.S.C. § 1692a(6)(F)(iii).  Thus, it "is well-settled . . . that . . . mortgage servicing companies are not debt collectors and are statutorily exempt from liability under the FDCPA," to the extent that they take action to collect debts that were not in default at the time they acquired the debts.  *Scott v. Wells Fargo Home Mortgage, Inc.*, 326 F. Supp. 2d 709, 718 (E.D. Va.) (emphasis omitted), *aff'd*, 67 F. App'x 238 (4th Cir. 2003); *accord Adam v. Wells Fargo Bank, N.A.*, Civ. No. ELH-09-2387, 2011 WL 3841547, at *20 (D. Md. Aug. 26, 2011); *Flores v. Deutsche Bank Nat'l Trust Co.*, Civ. No. DKC-10-217, 2010 WL 2719849, at *6 (D. Md. July 7, 2010); *Sparrow v. SLM Corp.*, Civ. No. RWT-08-12, 2009 WL 77462, at *2 (D. Md. Jan. 7, 2009); *see also De Dios v. Int'l Realty & Investments*, 641 F.3d 1071, 1075 n.3 (9th Cir. 2011) (citing legislative history of the FDCPA indicating that the exception in § 1692a(6)(F)(iii) was intended to provide that "'mortgage service companies and others who service outstanding debts for others, so long as the debts were not in default when taken for servicing,'" are not debt collectors).

Green Tree claims that it is not a "debt collector" with respect to plaintiff's mortgage because it comes within the FDCPA's exception for mortgage servicers.  Plaintiff contends that Green Tree does not qualify for the mortgage servicer exception because her mortgage was in default when Green Tree acquired it from PNC Bank.  In *Webb II*, I reserved ruling on this dispute until the summary judgment stage.

Plaintiff's argument is dependent on two propositions.  First, although the Assignment of the Deed of Trust from PNC Bank to Green Tree states that it is "[e]ffective" as of November 1, 2009, the Assignment was not actually executed until February 18, 2010.  According to plaintiff, for purposes of the FDCPA's mortgage servicer exception, the date of actual execution is what

counts.  Second, in February 2010, plaintiff made her mortgage payment late and thus she argues

that her mortgage was in default when the assignment was made.  The Note states that the

monthly mortgage payments are due "on the 1st day of each month."  Note ¶ 3.  Moreover, with

respect to late payments and default, the Note provides, Note ¶ 6 (emphasis added):

> (A) Late Charge for Overdue Payments
> If the Note Holder has not received the full amount of any monthly payment by
> the end of 15 calendar days after the date it is due, [Borrower] will pay a late
> charge to the Note Holder.  The amount of the charge will be 5.00% of [the]
> overdue payment of principal and interest.  [Borrower] will pay this late charge
> promptly but only once each late payment.
>
> (B) Default
> *If* [*Borrower does*] *not pay the full amount of each monthly payment on the date it
> is due,* [*Borrower*] *will be in default.*
>
> (C) Notice of Default
> If [Borrower is] in default, the Note Holder may send [Borrower] a written notice
> telling [Borrower] that if [Borrower does] not pay the overdue amount by a
> certain date, the Note Holder may require [Borrower] to pay immediately the full
> amount of Principal which has not been paid and all the interest that [Borrower]
> owe[s] on that amount. . . .

Green Tree argues that the date it "obtained" plaintiff's mortgage, within the meaning of

the FDCPA, was November 1, 2009, the effective date of the Assignment, and that plaintiff's

mortgage was not in default on that date.  In contrast, as noted, plaintiff insists that the date

Green Tree "obtained" the mortgage was February 18, 2010, the date the Assignment was

executed.

Defendant cites *Crone v. Bank of Am., N.A.*, No. 4:11-cv-733, 2012 WL 4754434, at *3

(E.D. Tex. Sep. 6, 2012), for the proposition that an assignment of a mortgage may validly be

backdated.  However, *Crone* did not address whether a mortgage assigned via a backdated

assignment is "obtained" by the assignee on the date of the assignment's execution or on the

backdated effective date.  Plaintiff cites Md. Code (2010 Repl. Vol., 2013 Supp.), § 2-103 of the Real Property Article, which provides: "Every valid assignment of a mortgage is sufficient to grant to the assignee every right which the assignor possessed under the mortgage *at the time of the assignment*."  (Emphasis added.)  However, that Maryland statute does not address whether the "time of the assignment" is the date the assignment is executed or that date that the assignment says that it is effective.  The "FDCPA does not define the term 'obtained,'" *Brown v. Morris*, 243 F. App'x 31, 34 (5th Cir. 2007), and I have not found case law directly addressing whether a mortgage is obtained by assignment on the assignment's execution date or its effective date.  However, there is no need to resolve this issue because, regardless of which date the mortgage in this case was obtained, I conclude that the mortgage was not in default.

To be sure, courts considering FDCPA claims involving mortgages that contain the same provision, expressly stating that a loan is in default if the monthly payment is not made on the first of the month, have endorsed the proposition that, if a mortgage is assigned at a time in the month when the borrower has not made his or her monthly payment, the mortgage is in default and the assignee is not entitled to the mortgage servicer exception.  *See, e.g.*, *Kapsis v. Am. Home Mortg. Serv'g, Inc.*, 923 F. Supp. 2d 430, 442 (E.D.N.Y. 2013); *Castellanos v. Deutsche Bank*, No. 1:11-cv-815, 2012 WL 2684968, at *6-8 (S.D. Ohio July 6, 2012); *see also Glenn v. FNF Serv'g, Inc.*, No. 5:12-CV-703-D, 2013 WL 4095524, at *4-5 (E.D.N.C. Aug. 13, 2013) (holding that borrower plausibly alleged that mortgage was in default when assigned to servicer "as of December 1, 2009, when the second payment was due and unpaid, *or* as of December 16, 2009, when the fifteen-day late payment grace period ended") (emphasis added).  However, in this case, the mortgage was assigned on February 18, 2010, and plaintiff asserts that she had

already made her monthly mortgage payment (albeit late) by that date, *i.e.*, on February 15, 2010. *See* Cross-Motion at 15.[46]  Even if plaintiff's mortgage was technically in default from February 2 through February 14, 2010, during which time her monthly payment was due and unpaid, that default was cured by plaintiff's alleged payment on February 15, before the mortgage was assigned on February 18.  Accordingly, even if Green Tree obtained plaintiff's mortgage on February 18, 2010, the mortgage was not in default at that time and Green Tree is exempt from liability as a "debt collector" under the FDCPA.

Even if Green Tree were subject to the FDCPA, however, plaintiff's FDCPA claims also fail on the merits because the undisputed material facts evince no conduct by Green Tree that would have violated the FDCPA.  In her complaint, plaintiff alleged that Green Tree violated two provisions of the FDCPA.  First, she asserted that, by "calling Plaintiff's tenant at work repeatedly to 'talk to' tenant about Plaintiff's 'default' and sending an agent to go to the home . . . who told the tenant that the home had been foreclosed and that the tenant would be locked out and her items removed," Amended Complaint ¶ 53, Green Tree violated 15 U.S.C. § 1692d, which provides that a debt collector may not "engage in any conduct the natural consequence of which is to harass, oppress, or abuse any person in connection with the collection of a debt." Such unlawful conduct includes, but is not limited to, "[c]ausing a telephone to ring or engaging

---

[46] Notably, plaintiff has not actually submitted any documentary evidence, or even her own sworn statement, regarding the date on which she made her February 2010 payment.  She merely asserts, in the Cross-Motion, that she paid on February 15, 2010.  This unsworn assertion in a legal brief is insufficient to establish a material fact for summary judgment purposes. *See, e.g.*, *EEOC v. CTI Global Sols., Inc.*, 815 F. Supp. 2d 897, 914 (D. Md. 2011) (To avoid summary judgment in the movant's favor, the non-moving party 'must present *evidentiary matter* showing that there is a genuine issue of material fact that is worth bringing to trial.' Defendant fails to present such evidence here, instead only presenting conclusory statements in its brief to support these assertions.") (emphasis in original) (internal citations omitted).

any person in telephone conversation repeatedly or continuously with intent to annoy, abuse, or harass any person at the called number." *Id.* § 1692d(5). Second, by "intentionally scaring off any current renter (by . . . hiring someone who told the tenant that the home had been foreclosed and calling her at work about the 'default') and threatening to run off any future renter," plaintiff alleged that Green Tree violated 15 U.S.C. § 1692e(10), which prohibits the "use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer."

But, as discussed, the undisputed material facts simply do not reflect that any such conduct actually occurred. Mr. Wood of Green Tree made two (or, at most, three) calls to plaintiff's tenant, none of which were perceived by Ms. Klamp as harassment. Moreover, the calls were made with the stated intention of getting in touch with Ms. Webb, not annoying or harassing Ms. Klamp. In those calls, according to the sworn statements of both Mr. Wood and Ms. Klamp, Wood did not discuss the reason that he needed to speak with Ms. Webb or mention that Ms. Webb's mortgage was in default. The conversation between Ms. Klamp and Green Tree's agent alleged in the complaint, in which the agent supposedly threatened Ms. Klamp that her possessions would be removed and that she would be locked out of the Property, never took place. When Mr. O'Donnell came to the Property, he did not do so as anyone's agent and he never made such threats. Further, Ms. Klamp was not at the Property when Mr. O'Donnell came, and she and Mr. O'Donnell never spoke, either in person or on the phone.

For all of the foregoing reasons, Green Tree is entitled to judgment as a matter of law as to Count VI, alleging violations of the FDCPA. For the same reason, Green Tree is also entitled

to judgment as to the negligence count, Count VII, which is predicated on the same conduct giving rise to the alleged FDCPA violations.

In her Cross-Motion, plaintiff newly argues that Green Tree was negligent in hiring Five Brothers because Five Brothers fails properly to train its independent contractors to perform home inspections, and that Green Tree was negligent in failing to train Mr. Wood about various aspects of foreclosure law or the need to document all contact with a borrower. *See* Cross-Motion at 18-19. These allegations do not appear in Count VII as presented in the complaint. But, even if I were inclined to permit plaintiff to "amend her complaint through argument in a brief opposing summary judgment," *Sensormatic Sec. Corp. v. Sensormatic Elecs. Corp.*, 455 F. Supp. 2d 399, 436 (D. Md. 2006), plaintiff's negligence claims fail because the undisputed material facts do not disclose that she suffered any damages as a result of this alleged negligence. And, "actual damages are a prerequisite for liability in negligence cases . . . ." *Peroti v. Williams*, 258 Md. 663, 671, 267 A.2d 114, 119 (1970); *see MacCubbin v. Wallace*, 42 Md. App. 325, 327, 400 A.2d 461, 463 (1979) ("[A] finding of 'no damages' in a negligence case is not compatible with a 'plaintiff's verdict.' Damage (or injury) is an essential element of actionable negligence just as are 'duty' and 'breach' essential elements of a negligence plaintiff's proof."); *accord Capital Centre, LLC v. Wilkinson*, 2006 WL 827375, at *12 (D. Md. Mar. 27, 2006) ("Damages is an essential element of any negligence claim under Maryland law . . . ."). Accordingly, Green Tree is entitled to judgment as to Count VII.

F.  Sanctions

In light of the serious variance between the allegations of plaintiff's complaint and the undisputed facts gleaned from discovery, Green Tree has moved for imposition of sanctions on plaintiff pursuant to Rule 11 of the Federal Rules of Civil Procedure.

Rule 11(b) provides, in pertinent part:

> By presenting to the court a pleading, written motion, or other paper—whether by signing, filing, submitting, or later advocating it—an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:
>
> > (1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;
> >
> > *    *    *
> >
> > (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and

"The primary purpose of Rule 11 is to punish violators and deter parties and their counsel from pursuing unnecessary or unmeritorious litigation." *Moody v. Arc of Howard Cnty., Inc.*, 474 F. App'x 947, 950 (4th Cir. 2012).  "[A] complaint containing allegations unsupported by any information obtained prior to filing, or allegations based on information which minimal factual inquiry would disprove, will subject the author to [Rule 11] sanctions." *In re Kunstler*, 914 F.2d 505, 516 (4th Cir. 1990).  *In Morris v. Wachovia Securities, Inc.*, 448 F.3d 268, 277 (4th Cir. 2006), the Fourth Circuit said plainly: "Factual allegations fail to satisfy Rule 11(b)(3) when they are 'unsupported by any information obtained prior to filing.'"  (Citation omitted).

Fed. R. Civ. P. 11(c)(2) permits a party to file a motion for sanctions against another party for violation of Rule 11(b), provided that, before filing the motion with the court, the moving party must serve it on the opposing party and give the opposing party 21 days to

withdraw "the challenged paper, claim, defense, contention, or denial." Green Tree served a draft of its Sanctions Motion on plaintiff in advance of filing it with the Court, as required. *See* Sanctions Motion at 4. Moreover, in May 2012, a week after Ms. Klamp's deposition was taken, Green Tree wrote to plaintiff demanding that she voluntarily dismiss her claims in light of Ms. Klamp's deposition testimony, which directly contradicted the allegations of plaintiff's complaint in multiple material respects. *See* ECF 77-3. Plaintiff rebuffed the demand, arguing that Ms. Klamp's recollection was mistaken and that the allegations of her complaint were an accurate reflection of her notes, made contemporaneously with the events. *See* ECF 77-4.

As noted, Local Rule 105.8(b) provides that a party need not respond to a motion for sanctions under Rule 11 unless ordered to respond by the court. Under Local Rule 105.8 and Rule 11(c)(1), a court must give a party notice and an opportunity to respond before imposing sanctions. In my view, the state of the record raises a serious question regarding plaintiff's compliance with Rule 11(b) in the prosecution of this action. In comparison to the summary judgment record, discussed at length above, it is difficult to view plaintiff's complaint as anything but an exercise in speculative fiction: a narrative of events that might have happened, not a statement of events that did happen. Although I do not foreclose the possibility that plaintiff will be able to demonstrate that she pursued her complaint "to the best of [her] knowledge, information, and belief, formed after an inquiry reasonable under the circumstances," Fed. R. Civ. P. 11(b), the state of the record makes it imperative that plaintiff explain her litigation conduct by responding to defendant's Sanctions Motion. Therefore, I will direct her to do so.

In the meantime, the Court will enter judgment in favor of Green Tree as to all substantive counts, thereby rendering final judgment on the merits. Accordingly, I will direct the Clerk to close this case for statistical purposes. If, upon receipt of Webb's response to the Sanctions Motion, Green Tree wishes to litigate the Sanctions Motion, it may renew its Sanctions Motion and reply to plaintiff's response.[47] In the interim, I will deny the Sanctions Motion, without prejudice to Green Tree's right to renew it.

An Order implementing my rulings follows.


Date:   September 30, 2013                      _____/s/_____
                                               Ellen Lipton Hollander
                                               United States District Judge

---

[47] The parties are reminded that whether "to impose Rule 11 sanctions, and the quality and amount of the sanctions imposed," are all matters within the discretion of the district court. *Miltier v. Downes*, 935 F.2d 660, 663 (4th Cir. 1991). *See* Fed. R. Civ. P. 11(c)(1) ("If . . . the court determines that Rule 11(b) has been violated, the court *may* impose an appropriate sanction . . . .") (emphasis added). In making a determination as to the amount of a monetary sanction, a court must consider the *Kunstler* factors, which include the "'severity of the Rule 11 violation,'" the "'reasonableness of the opposing party's attorney's fees,'" the "'minimum to deter,'" and the "'ability to pay.'" *Brubaker v. City of Richmond*, 943 F.2d 1363, 1374 (4th Cir. 1991) (quoting *In re Kunstler*, 914 F.2d 505, 523 (1990), *cert. denied sub nom. Kunstler v. Britt*, 499 U.S. 969 (1991)). Moreover, the "amount of a monetary sanction . . . should always reflect the primary purpose of Rule 11—deterrence of future litigation abuse." *Brubaker*, 943 F.2d at 1374.